**BOSTON SHIPYARD CORPORATION**

v.

**The UNITED STATES.**

Nos. 577–84C, 337–85C.

United States Claims Court.

June 3, 1986.

Stuart S. Dye, Washington, D.C., for plaintiff. Gary W. Christian and J. Michael Cavanaugh, of counsel.

Kenneth Oestreicher, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant. Gregory A. Harrison, Dept. of Justice, and William Kerivan, Panama Canal Com'n, of counsel.

## OPINION

HARKINS, Judge:

In these consolidated cases, Boston Shipyard Corporation (BSC) appeals, under the direct access provisions of the Contract Disputes Act of 1978, decisions of the contracting officer in a contract with the Panama Canal Commission (PCC), an agency of the United States. 41 U.S.C. § 609(a) (1982). BSC contracted, in a fixed price supply contract, to design and construct a harbor tug in accordance with PCC guidance plans and specifications. The completed vessel (the PAZ) was to be delivered on August 4, 1984. On August 6, 1984, the contracting officer terminated the contract for default for failure to deliver. Plaintiff seeks to convert the default termination into a termination for convenience of the Government, to recover equitable adjustments for constructive changes and extra work, and to recover termination costs. Plaintiff's net claim is $1,884,193.58. Defendant has counterclaimed to recover unliquidated progress payments in the amount of $759,819.01. After a 9–day trial on plaintiff's claims during the period May 12–22, 1986, a bench ruling in favor of defendant was made on May 23, 1986.

Significant factual developments are discussed for perspective on the decision. Detailed findings of fact are provided below.

BSC was a new small business venture that had been incorporated and started in January 1983. It acquired and operated shipyard facilities that previously had been owned, and, until October 1982, operated by the Bethlehem Steel Corporation.

Arrangements for ownership of the shipyard were concluded in June 1983. At that time, extensive reorganization of facilities and personnel was underway, and a physical inventory of leftover supplies and equipment from Bethlehem Steel Corporation had not been completed. Facilities at the shipyard, which had been modernized in World War II, were designed primarily for repair, overhaul, and maintenance of marine vessels.

BSC had never constructed a tugboat of any type, and no vessel had been constructed in the shipyard since 1900. The BSC work force had no actual experience in construction of tugboats, and BSC's management lacked experience in new ship construction. In July 1983, BSC had approximately 172 employees; its total employment increased to a maximum of approximately 400 employees.

The IFB was issued April 15, 1983; 19 bids were secured; and bid opening was June 30, 1983. Plaintiff's bid of $2,055,925 was the lowest; the next lowest bid, by Eastern Marine, Inc., also a small business, was for $2,149,000, a difference of $93,075.

The IFB established a special standard for contractor responsibility. Each bidder was to furnish written evidence "that he has been successfully engaged in the construction of tugboats similar to the one

described in Item No. 1 of this solicitation during the last five years."

In the preaward surveys of BSC and Eastern Marine, Inc., it was found that BSC, because of lack of experience, was nonresponsible. It was also found that Eastern Marine affirmatively met the responsibility standards because it had constructed a number of new tugboats in the preceding 5 years. On July 29, 1983, the contracting officer determined that BSC was nonresponsible, that Eastern Marine was fully responsible, and decided that the contract should be awarded to Eastern Marine in the bid amount of $2,149,000.

The contracting officer requested the Small Business Administration (SBA) to review his findings and approve the decision. The SBA, however, on August 26, 1983, certified that BSC was responsible to perform the proposed procurement covered by the IFB. Accordingly, PCC awarded the contract to BSC. The notice of award was sent on August 29, 1983.

The contract was on standard forms applicable to a fixed price supply contract. General Provisions No. 11 (Std. Form 32, Rev. 4–75) contained the default article, and the Modifications to the General Provisions included, as No. 30, Termination for Convenience of the Government.

The contract gave an option to PCC to purchase one additional identical tugboat at the same price, to be exercised at any time from date of award through January 31, 1984. Plaintiff's president testified that its bid was prepared so as to recover its costs on the PAZ and that BSC could not make a profit unless it was awarded contracts to construct both tugs.

From the beginning, plaintiff had difficulty in maintaining its production schedule. In an inspection by PCC staff on November 22–23, 1983, BSC officials confirmed that construction was 5 to 6 weeks behind schedule. On December 14, 1983, BSC's contract administrator reported to the SBA that production overall was behind schedule approximately 6 weeks. At a meeting on January 31, 1984, the contracting officer determined that BSC was behind its production and material schedules substantially and decided not to exercise the option for an additional tugboat from plaintiff. Plaintiff was advised, at the meeting, that the option would not be exercised.

On April 18, 1984, the contracting officer notified BSC that it had failed to make progress under its revised production schedule, directed accelerated progress so as to assure timely completion, and issued a 10–day cure notice under the default clause. The letter noted that plaintiff on February 29, 1984, was approximately 1½ weeks behind its revised production schedule, and that plaintiff's new production manager had stated his goal was to have the tug completed and in Panama on July 1, 1984.

On May 8, 1984, BSC responded. BSC stated it believed the tug was on schedule, and that the July 1, 1984, delivery date was not a firm commitment by the project manager. BSC contended it was committed to meeting critical scheduling problems and that it would provide necessary resources to overcome production bottlenecks. It stated "BSC has not changed the delivery date", that the PAZ would be transferred to drydock during the week of May 29, 1984, and launched for trials during the first week of July 1984. On June 1, 1984, the contracting officer advised BSC that he had decided "not to terminate the contract at this time." He emphasized that BSC must "adhere to the corrective measures outlined in your letter."

Under BSC's construction plan, the tugboat hull was built inside a shed (the Boiler Shop) 200 feet from where the hull could be launched. In order to complete the tug, it was necessary to move the hull out of the Boiler Shop in which it was constructed to a drydock outdoors so that heavy equipment, such as the main engines and the deckhouse, could be attached to the hull of the vessel. It also was necessary to move the tug to a drydock for completion because BSC, when it erected a support cradle for the hull, had failed to provide sufficient clearance to install the flanking rud-

ders. On June 27, 1984, an attempt was made to move the hull from the Boiler Shop. The hull settled to the stern and crushed the rollers under the aftermost point of the base of the keel.

During the period from June 27, 1984, to July 8, 1984, plaintiff did not perform substantial amounts of work on the tug. The contracting officer had a continuing concern over BSC's failure to maintain its schedule. He called a meeting for July 17, 1984, to determine if PCC could assist BSC and whether timely delivery could be realized.

The meeting, on July 17, 1984, at BSC, was attended by BSC's president, and its director of engineering. PCC was represented by the contracting officer (CO), the contracting officer's representative (COR) and representatives from PCC's Navigation Division.

There were three meetings: a morning session attended by all participants, a private meeting between the BSC president and the contracting officer, and an afternoon session attended by all participants. What transpired at each session is not clear; the testimony of witnesses who participated conflict as to what was said and when particular matters were raised. The following transactions and statements, however, occurred:

1. BSC's president presented three documents to the contracting officer: (a) a letter opinion from a naval architect, John W. Gilbert Associates, Inc., concerning the structural integrity, maneuverability and docking difficulty presented by the absence of a skeg; (b) an unsigned document that contained allegations and argument that would apply to an equitable adjustment, under three topic headings: Availability of Plans, As-Constructed Plans, and Plan Approval; and (c) a telex from Michigan Wheel Corporation, the manufacturer of the towmaster rudder system, relative to inadequate performance specifications. Plaintiff's claims relative to the matter in (c) were abandoned prior to trial. The mat-

ter in (c) had no impact on contract performance.

2. PCC presented a list of problems that had arisen in construction to date, which all parties agreed could be corrected.

3. Plaintiff's president discussed financing difficulties, and the need for progress payments, to provide the cash flow necessary to move the PAZ and complete construction. Arrangements were made for the contracting officer to approve partial progress payment No. 5 for $345,879.51 so that work could continue.

4. Plaintiff's president complained to the contracting officer about interference caused by the COR. These complaints, and the allegations in the unsigned document in (b), were not accompanied by or associated with requests for time extensions.

5. Plaintiff's president, on the basis of the naval architect's letter in (a), asserted the design of the PAZ without a skeg was defective, and that the vessel was structurally unsound, unseaworthy and liable to damage in drydock and on the seas en route to Panama. He requested the contracting officer to have an analysis made of the need for a skeg. PCC's representatives contended the original design was adequate and the PAZ would be structurally sound and seaworthy without a skeg. The contracting officer agreed to have the American Bureau of Shipping (ABSTECH) review the PAZ for structural integrity without a skeg. The contracting officer told BSC that his experts, including ABSTECH, did not feel the structure was inadequate, and that the PAZ could be moved safely. The contracting officer reiterated that BSC was responsible for timely delivery of the PAZ.

On July 25, 1984, the COR learned in a telephone conversation that the ABSTECH report would conclude that the PAZ was structurally sound without a skeg. This information was given to the contracting officer by telephone. On August 1, 1984,

the COR obtained the written report of ABSTECH, dated August 1, 1984, on the pros and cons of fitting a centerline skeg. The ABSTECH report was based on a report by CT Marine, dated July 21, 1984, which the COR obtained on August 2, 1984. ABSTECH and CT Marine in their reports had recommended that a skeg be added for ease in drydocking.

On August 3, 1984, the COR by telephone informed BSC that ABSTECH had reported the PAZ was structurally sound without a skeg. The COR, on instructions from the contracting officer, did not mention to BSC the ABSTECH—CT Marine recommendation that a skeg be added for ease in drydocking.

The PAZ was not delivered by August 6, 1984, and on that date the contracting officer formally notified BSC that the contract was terminated for default, effective immediately. At the time the contract was terminated, the PAZ was between 70 to 80 percent complete. It would have required plaintiff an additional 7 to 8 weeks to complete and deliver the PAZ. The COR estimated the project was 7 to 9 weeks behind schedule. Plaintiff's president testified that he believed the tug could have been delivered during the first week of October 1984.

On August 4, 1984, the contract delivery date, there were no requests for time extensions that had been submitted to the contracting officer for action. Prior to the termination, BSC had not submitted a request for an extension of time to complete the contract based upon any action of the COR in ordering a change or delaying action on a drawing, or based upon any failure of PCC to deliver guidance drawings, or upon any inadequacy in the as-constructed guidance drawings, or to permit further study and analysis of the need to add a skeg before the PAZ was moved and completed. At the July 17, 1984, meeting BSC's president was concerned with financial matters, and although the unsigned position paper was delivered and discussed, no request was made at that meeting for an extension of the delivery date. The

position paper itself lacked sufficient detail and supporting information to satisfy the requirements for a formal claim. It was not presented as an informal request for more time.

As of July 17, 1984, BSC in fact could not have delivered the PAZ by August 4, 1984. Plaintiff's president took the position that he would not move the PAZ pending resolution of the skeg controversy, and the contracting officer had lost all faith in BSC's ability to complete timely performance. In these circumstances, BSC's failure to make a record after July 17, 1984, that a time extension was needed and was appropriate, is illogical in the light of the parties' declarations and intentions that BSC now asserts. BSC's failure to make such a record is inexcusable.

On August 2, 1984, plaintiff mailed a letter to the PCC which was received on August 7, 1984. This letter gave notice of BSC's intent to submit a claim for an equitable adjustment in the following areas: ADDITIONAL PLAN WORK; DEFECTIVE PERFORMANCE REQUIREMENTS; CONSTRUCTIVE CHANGE ORDERS; and ADDITION OR ABSENCE OF A SKEG. This communication was incomplete as a claim. It lacked specific detail and was not supported by backup information.

BSC submitted a formal claim on February 28, 1985. BSC claimed that the PCC had wrongfully terminated the contract for default, that the failure to deliver should be excused, and that BSC was entitled to equitable adjustments and termination costs amounting to $1,884,193.58. The elements of this claim were:

| | | |
|---|---|---|
| 1. | Amount Due Under Contract, as Amended (without equitable adjustments) | |
| | Contract Price: | $2,115,189.00 |
| | Percentage of Completion: | 80% |
| | Total: | $1,692,151.20 |
| 2. | Equitable Adjustments | |
| | Labor and Material: | 335,617.00 |
| | Profit (10%) | 33,561.70 |
| | Total: | 369,178.70 |
| 3. | Termination Costs | 582,681.69 |
| | TOTAL | $2,644,011.59 |

| | |
|---|---|
| LESS PROGRESS | |
| PAYMENTS RECEIVED | 759,818.01 |
| NET CLAIM | $1,884,193.58 |

On May 6, 1985, the contracting officer decided that BSC's claim for wrongful termination was without merit and that BSC was not entitled to have the termination converted to a termination for convenience. BSC's claims for equitable adjustments and termination costs were denied.

Subsequently, BSC's claim was audited by the Defense Contract Audit Agency. The audit disclosed that plaintiff's accounting records did not segregate labor costs of the PAZ from the labor costs applicable to the eight or nine other projects that plaintiff was working on during the relevant period. The 24,980.5 direct labor contract hours claimed by BSC for the period of contract performance through July 1, 1984, were not actual hours expended but were 80 percent of the original contract labor estimate. The 20 percent disruption and production manhours were based on engineering estimates. There were no records that supported the labor and material costs for which equitable adjustments were claimed. Hours attributed to delays in delivery of drawings, interference by the COR, and constructive changes were derived from engineering estimates. They were not reflected in the accounting records maintained by BSC. The audit questioned $1,725,712 of the costs claimed and found unsupported $918,299 of the costs claimed for equitable adjustments.

## DISPOSITION

The principal issue in these cases, whether plaintiff's failure to deliver the PAZ on the contract date is excusable because of acts of the Government under the standards of the default clause, is particularly fact intensive. In such a context, the credibility of witnesses assumes special significance. During the trial, the testimony of the fact witnesses, for both parties, obviously was shaped to forward their particular cause. Memories were perfect as to the details of matters that were helpful, but nonexistant as to entire subjects that were seen as potentially harmful. The testimony, on both sides, added a gloss that cannot withstand examination. There were changes from positions that had been taken during depositions, and even changes from previous testimony taken during the course of examination at trial. Such vacillation, and tailoring of testimony, places in question the credibility of the major actors on both sides. As a result, written records contemporary with the events involved are considered to be more accurate and are accorded greater weight than the reconstructed versions presented in trial testimony.

The termination for default was made pursuant to the standard clause in the general provisions of a fixed price supply contract (Gen.Prov. No. 11, Standard Form 32—Rev. 4–75). The default clause, in subsection (a)(1), authorizes a contracting officer to terminate the contract if the contractor "fails to make delivery of the supplies or to perform the services within the time specified" in the contract or any extension to the contract. Subsection (c) provides the contractor shall not be liable for any excess costs if the failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the contractor, including "acts of the Government in either its sovereign or contractual capacity." Subsection (e) provides, in part, that if, after notice of termination of the contract under the provisions of the default clause, it is determined for any reason that the contractor was not in default, or that the default was excusable under the provisions of the clause, the rights and obligations of the parties shall be the same as if the notice of termination had been issued pursuant to a termination for the convenience of the Government.

The Government's right to terminate a contract for default is assured by regulation and by contract provision. It is a remedy available to the government that has long been recognized and accorded effect in both construction contracts and supply contracts. *National Surety Corp. v. United States*, 102 Ct.Cl. 671 (1945); *Uni-*

*versal Fiberglass Corp. v. United States*, 537 F.2d 393, 210 Ct.Cl. 206 (1976). Termination for default, however, is a drastic adjustment of the contractual relationship and the Court of Claims held the Government to strict accountability in using this sanction. *J.D. Hedin Const. Co. v. United States*, 408 F.2d 424, 431, 187 Ct.Cl. 45 (1969); *Schlesinger v. United States*, 390 F.2d 702, 709, 182 Ct.Cl. 571 (1968).

A termination for default generally results in lost time to the Government in obtaining the services or goods it sought; it always penalizes the contractor, and frequently the Government is exposed to substantial additional costs, particularly if the action subsequently is found to be one for convenience of the Government. Further, a default termination is an acknowledgment that previous procedural safeguards, —*i.e.*, bidding and negotiation procedures to select a contractor, examinations to determine contractor competence and qualifications, and review and approval of subcontracts and subcontractors—have failed to realize their purposes.

In these cases, the termination was made pursuant to the authority in Gen.Prov. No. 11(a)(i) for failure to deliver within the time specified in the contract. The contracting officer, after the April 18, 1984, cure notice, in his June 1, 1984, letter decided not to exercise the authority conferred by Gen. Prov. No. 11(a)(ii) to terminate for failure to make progress. Case law that applies to terminations for failure to make progress, and abandoned or repudiated contracts, is not relevant to termination in these cases. *See Discount Co. v. United States*, 554 F.2d 435, 441, 213 Ct.Cl. 567, *cert. denied*, 434 U.S. 938, 98 S.Ct. 428, 54 L.Ed.2d 298 (1977); *Universal Fiberglass Corp. v. United States*, 537 F.2d 393, 398, 210 Ct.Cl. 206 (1976); *Philadelphia Regent Builders, Inc. v. United States*, 634 F.2d 569, 225 Ct.Cl. 234 (1980).

The facts, relative to the standard that applies to a failure to deliver under subsection (a)(i) of the default clause, are straightforward and clear. On August 4, 1984, BSC did not deliver the PAZ. Further, on that date, BSC could not deliver. The PAZ at best was only 80 percent complete, and an additional 7 or 8 weeks of work remained to be done. In addition, the contracting officer was confronted with no administrative impediments that required disposition before notice of the termination could be given. The contract date had not been extended, and there were no requests, formal or informal, before him for extensions of the time to deliver. Finally, the question of the structural integrity of the PAZ in the absence of a skeg had been resolved in the reports of ABSTECH and CT Marine, and the COR had telephoned to BSC that part of the reports' recommendations.

BSC relies upon provisions in Gen.Prov. No. 11(c) that excuse the contractor when the failure to deliver on time arises out of causes beyond its control due to acts of the Government in its contractual capacity. The acts or omissions relied upon by BSC, which allegedly hindered or delayed its delivery of the PAZ on August 4, 1984, include: (1) whether the PAZ was structurally unsound, unseaworthy for movement to Panama, and liable to damage in drydock because it had been designed and constructed without a skeg; (2) interference by the COR by means of improper instructions to floor workers; (3) constructive changes ordered by the COR; (4) late delivery of guidance drawings that delayed efficient start-up and construction of the PAZ; (5) inadequacy of the as-constructed guidance drawings that necessitated unforeseen work; and (6) failure of the contracting officer to give timely approval or disapproval of BSC plans and drawings, and changes ordered by the CO and the COR after approval previously had been given.

In final analysis, all of plaintiff's contentions with respect to the matters cited as an excuse for nondelivery fail for lack of proof. The testimony and documentary evidence in the record do not establish facts that are needed to support plaintiff's assertions.

Before the termination notice, BSC had not requested time extensions for any of

the matters involved in the excuses. Further BSC has no records or other supporting materials that reflect the impact of the specific acts alleged in terms of delay and cost. In addition to an absence of accounting or other documentary support relative to the effects of specific acts of the Government, documents in the record contemporaneous with the events cited do not accord with the allegations made in plaintiff's February 28, 1985, formal claim. BSC did not raise these matters as an excuse for its nonperformance until the July 17, 1984, meeting, nearly at the end of the performance period.

*Skeg Issue*

The skeg issue, and the effect of the absence of a skeg on structural integrity of the PAZ, is central to BSC's assertion that it should be excused for its failure to do substantial amounts of work after the unsuccessful attempt to move the hull out of the Boiler Shop on June 27, 1984. Plaintiff's argument on the skeg issue is that, by the time of the July 17, 1984, meeting, sufficient evidence had been accumulated to demonstrate that the PAZ, without a skeg, was structurally unsound and unseaworthy so as to warrant cessation of work until the PCC had clarified whether a skeg should be added. After that meeting, the argument goes, BSC reasonably was led to believe that PCC no longer was insistent on delivery by August 4, and that conduct of the CO reasonably led BSC to believe that PCC would accept late delivery of the PAZ, subject to payment of $1,000 per day liquidated damages.

As to the need for a skeg, BSC emphasizes that a skeg had been included on all previous tugs, and that a modified docking support, or skeg, is on all subsequent tugs. In addition, BSC claims it became concerned when a deflection or deviation allegedly was observed in April 1984 during line boring of the nozzles for the propeller shafts. Further, heavy point loading on the aftermost part of the keel is claimed to have caused the hull to settle when an attempt was made to move it on June 27, 1984. This concern, in turn, is said to have caused BSC to seek independent opinion on the need for a skeg. The Gilbert opinion, on July 16, 1984, confirmed that the longitudinal strength and continuity of the structure had been compromised, with resultant operational deficiencies, and that the only solution would be to add a skeg.

BSC's argument that PCC had waived the delivery date rests upon acts by the CO at, and after, the July 17, 1984, meeting. The contracting officer at the July 17, 1984, meeting agreed to have ABSTECH, at PCC's expense, review the design for structural integrity without a skeg. On July 24, 1984, the contracting officer approved a partial progress payment of $345,879.51, which brought the total progress payments to $759,819.01. These acts, when coupled with the fact that by July 17, 1984, work on the PAZ was at a stage when little more could be accomplished inside the Boiler Shop, are said to confirm that time of delivery was no longer a major concern of PCC.

Plaintiff's argument is in disregard of the specific obligations it undertook in the contract. It ignores the CO's insistence at the July 17, 1984, meeting that work should continue because the PAZ was structurally sound and could be moved, and that there was no waiver of the delivery time.

A skeg is a vertical fin on the hull of the vessel, usually in the stern. Some vessels are fitted with skegs to assist in supporting the stern of the vessel during drydocking. Each of the previous similar design tugs constructed for the PCC by Bollinger Machine Shop & Shipyard, Inc., upon which the guidance plans for the PAZ were based, had a large centerline skeg running aft from the base of the keel to frame 48.

In operation, the skegs on the ALIANZA class tugs were found to block the flow of water to flanking rudders and to affect adversely lateral maneuvering. There is general agreement among the experts who testified that a tug could be built without a skeg, and that a tug without a skeg would be structurally sound. There also is general agreement that a tug without a skeg could be drydocked, but that drydocking is made much more difficult.

The guidance plans and specifications for the PAZ provided to BSC before the contract was awarded showed the PAZ would have no skeg. All bidders were aware of this requirement. No bidder expressed concern about the absence of a skeg. BSC bid for the contract fully cognizant of its responsibility to build the tug without a skeg.

At the time the PCC issued the IFB and specifications for the PAZ, its Marine Bureau intended to request that the skeg be removed from the ALIANZA. The purpose of the proposed elimination was to increase lateral maneuverability. After award of the contract, the PCC's Navigation Division requested the Industrial Division to cut off the skeg from the tugboat ALIANZA, but the Industrial Division suggested modifying rather than eliminating the skeg. Instead, lightening holes were cut into the skeg to increase maneuverability.

BSC learned of the ALIANZA modification in April 1984. BSC, however, never requested permission, formally or informally, to build the hull with a skeg, or a contract modification to add a skeg to the PAZ after the hull was constructed.

BSC had design responsibility for items in the PAZ that embodied changes from the ALIANZA class design. This responsibility was acknowledged at trial by the BSC's director of engineering. The PAZ was different from other boats in the ALIANZA class in a number of aspects, in addition to the absence of a skeg. Other differences included the main steering system, changes in the main deckhouse, fuel transfer pumps, sewage treatment plant and the four cylinder hydraulic engines. All of these differences required new design effort which under the contract was the responsibility of BSC.

BSC cites a number of circumstances that are claimed to have alerted it to the need for a skeg: deflections or deviations observed in April 1984, during line boring for the propeller shafts, distortion seen in the aft engine bulkhead, and excessive point loading on the aftermost part of the keel as a cause for hull settling during the

June 27, 1984, move. A preponderance of the evidence indicates plaintiff's accounts of these observations are inflated. The testimony is in conflict regarding deflections of the stern during line borings for the propeller shafts, and the record does not establish that such deflections in fact occurred. The alleged distortions in the bulkhead, if they occurred, were no more than the normal results of welded construction. The effect of the alleged point loading in the opinions of the experts, is not clear. If BSC had a concern about the skeg absence, at the times alleged, such concern was not timely communicated. The record is significantly barren of any concern about the absence of a skeg until after the attempt to move the hull on June 27, 1984.

The fact that, subsequent to BSC's contract, the PCC resolved the docking problem caused by the absence of a skeg by the addition of a docking support (a small skeg) and resolved the maneuverability problem of previously built ALIANZA class tugs by cutting lightening holes in the large skegs, does not establish that the original design for the PAZ without a skeg was defective, or that the PAZ as designed was unseaworthy, or that it lacked structural integrity. These subsequent changes, made by the PCC to accommodate maneuverability problems and to facilitate ease in docking, do not establish that plaintiff was misled when it bid on the contract, or that it was provided faulty information. Nor does the fact that such changes have been made establish that PCC breached its warranty that the specifications for the PAZ describe a tug that could be safely operated and drydocked.

To support its argument that acts by the contracting officer, after the July 17, 1984, meeting indicated time no longer was of the essence and that the acts constituted a waiver of the delivery date, BSC cites *DeVito v. United States*, 413 F.2d 1147, 188 Ct.Cl. 979 (1969). In *DeVito*, the Court of Claims found that a waiver of a delivery date may be made by the conduct of a contracting officer and that the waiver

need not be in writing. *DeVito* involved a fixed price supply contract when there was default termination after failure to make an interim delivery. The Court of Claims found that a delay of 40 days before the CO acted to terminate was sufficient to constitute a waiver after default. In *De-Vito,* the Court of Claims noted that time is of the essence in any contract containing fixed dates for performance, and held that when a due date has passed and the contract has not been terminated for default within a reasonable time, an inference is created that time is no longer of the essence. In such a situation, so long as the constructive election not to terminate continues, and the contractor proceeds with performance, the proper way for time to again become of the essence is for the Government to issue a notice under the default clause setting a specific time for performance. *DeVito v. United States,* 413 F.2d at 1154.

■ The doctrine of waiver after default enunciated in *DeVito* does not apply to the termination of BSC's contract. The default occurred when BSC failed to deliver the PAZ on August 4, 1984. With no delay, the CO gave written notice of termination on the next working day, August 6, 1984.

The CO's agreement to have ABSTECH review the PAZ design and his making an early progress payment are not acts that constitute a waiver of the delivery date or acts that create an inference that time no longer is of the essence. BSC was told specifically by the CO that it was expected to continue work, and that the delivery date had to be met. PCC's engineers, as well as the ABSTECH representative, agreed that the PAZ could be moved without damage. There was no concurrence with BSC in its decision to stop work. BSC did not stop work on the PAZ because of an inference that the premature progress payment indicated that time no longer was of the essence. Work on the PAZ had essentially stopped by July 9, long before the progress payment was made on July 24, 1984, and before the discussions for the payment at the July 17, 1984, meeting.

*Constructive Changes—COR Interference*

BSC asserts the COR interfered with production and hindered efficient prosecution of the work by means of improper instructions to floor workers. BSC also charges the COR with verbally and in writing issuing constructive change orders. The resulting rework, misdirection and confusion are said to have delayed the work 30 days and to have increased costs by $49,-131. BSC contends the COR was incompetent because he had no experience as a COR before appointment for the PAZ contract, and because he had no experience in ship construction.

The ad hominem attacks on the COR are not justified. Before appointment on September 1, 1983, the COR had 17 years experience as Chief Engineer on PCC towboats and, since 1980, had been Chief Engineer-in-Charge, Towboats, Navigation Division. He attended the Corps of Engineers training course for CORs in October 1983, and a training course on "Inspections, Acceptance and Warranties" in November 1983. The monthly reports prepared by the COR show a commendable attention to detail. His daily log demonstrates the scope of his activities.

The COR was a member of the preaward survey team and he had joined in the recommendation that BSC was not eligible for contract award under the IFB experience requirement. This recommendation, and its reversal by the SBA, did little to establish a good relationship on his appointment as site representative for the CO.

As COR, his duties included surveillance and reporting on BSC's progress. His monthly report for November shows that BSC was 4–5 weeks behind its own November 1, 1983, production schedule. This surveillance over BSC's ability to maintain its schedule was a source of annoyance. By letter dated January 5, 1984, BSC advised the CO that the COR had been requested to confine his inquiries to BSC's contract administrator and its chief engineer. This request was to insure that the COR reported accurately BSC's schedule status. On May 8, 1984, BSC reiterated its complaint

that the COR's lack of background placed him in a position of not being able "to qualify a judgment decision or assessment of a production plan/schedule or the weighting of the craft/trades thereto." Both of these complaints were concerned with COR reports on the status of completion. Neither was concerned with examples of interference and improper instructions to floor workers or of constructive change orders.

Inspection was an assigned responsibility, and the COR was required to be on the site daily in order to keep informed about construction activities. BSC provided PCC a chart which showed the management's structure of BSC's nine shops. The individuals named for six of the shops were leadmen, and the individuals named for the remaining three shops were supervisors. The chart was prepared to designate the individuals that were BSC's management for the PAZ project.

The evidence does not show that the COR interfered with floor workers or tradesmen. BSC did not present evidence that the COR addressed his comments to anyone other than a designated leadman, foreman, engineer or other management personnel of BSC.

As to alleged orders for constructive changes, the evidence shows that the incidents BSC cites, in fact, were instances where the COR was performing authorized inspections, or were instances where the COR supplied answers to questions from BSC personnel.

BSC was aware that the COR was not authorized to make changes in the contract. It made no complaints about improper directions from the COR until the July 17, 1984, meeting. The evidence does not establish that the COR ordered changes to work that would amount to constructive changes eligible for equitable adjustments in money or time.

*Drawings*

BSC claims that it was delayed 30 days by receipt on September 29, 1983, of the additional 27 "as-constructed" guidance drawings that under specification paragraph 2-08(f) were to be furnished after contract award. The contract was awarded on August 26, 1983, and BSC was notified by telex on August 29, 1983. The parties stipulate that the contract performance period began on September 9, 1983. The additional drawings were mailed to Boston on September 16, 1983, and were made available to BSC on September 29, 1983.

Plaintiff argues that a reasonable time for receipt of the drawings would be 5 working days and would have the 5-day period start from the date of award rather than from receipt of notice of award. The evidence shows that the additional guidance drawings were mailed within one week of the time the contract performance time began to run. This period is not unreasonable.

Use of the mail to transmit drawings is normal in government contracting. It was the customary practice used by PCC in sending drawings to contractors.

Late delivery of these drawings had no impact on BSC's start-up. The record shows that the steel, the first material needed to begin fabrication of the hull, was ordered before the additional guidance drawings arrived. Some of the steel was delivered to the shipyard before September 29, 1983. BSC ordered steel on September 13 and September 19, 1983; the first delivery of steel for the keel and hull was made on September 19, 1983. BSC fabricated the cradle and laid the keel during the first week of October 1983. By the end of the first week in October, BSC had completed sufficient work to meet the milestone for a 5 percent progress payment.

BSC claims the "as-constructed" guidance drawings, particularly the piping drawings, were inadequate. The parties agree that the piping drawings were diagrammatic and did not show the actual location of piping on the Bollinger boats.

Testimony of the experts reflects different contentions as to ship building industry practice and what is the expected content of an "as-constructed" drawing. Plaintiff's expert defined an "as-constructed" draw-

ing as one that shows the system in detail, in three dimensions, as actually installed. To qualify as an "as-constructed drawing" under his definition, the drawing would have at least two of the following elements: (1) a plan or birdseye view, (2) an elevation, and (3) a section cut through the centerline.

The "as-constructed" guidance drawings provided by PCC did not meet the definition of plaintiff's expert. The PCC guidance drawings, however, did meet the standards for "as-constructed" drawings in the ship building industry for vessels that are the size of ALIANZA class tugs. The "as-constructed" drawings that were supplied were drawings actually used in construction of the Bollinger boats. They were drawings delivered to and accepted by PCC as "as-constructed" drawings. In any event, Specification paragraph 2–08(a) required BSC to prepare the necessary working drawings and shop detail drawings as required to complete construction of the tugboat. The "as-constructed" drawings provided by PCC were for guidance only.

Plaintiff's claim includes a request for an equitable adjustment for time and costs expended in plan development to produce "as-constructed" piping drawings for the PAZ. BSC asserts 25 percent of the total 160 days spent on the vessel, or 40 days, was spent in this effort, and that the costs amounted to $137,165.50.

The piping drawings listed in the Plan Development section of BSC's claim were submitted on or after May 21, 1984.

| Drawing | Submitted |
|---------|-----------|
| 83–01–22 | 6/29/84 |
| 80–300 (83–01–23) | 6/29/84 |
| 83–01–25 | 5/21/84 |
| 83–01–26 | 7/12/84 |
| 83–01–27 | 6/29/84 |
| 83–01–28 | 6/06/84 |
| 83–01–47 | 7/09/84 |
| 83–01–48 | 5/21/84 |

The record does not correlate the production of these drawings with the installation of the related work on the PAZ. Nor does the record establish the effect in time and costs in the production of these drawings.

BSC submitted, under Specification paragraph 2–08, a total of 37 drawings to PCC for approval. The record shows that 24 of the 37 drawings forwarded to PCC were submitted after June 1, 1984. The distribution was: 2 in December 1983, 1 in January 1984, 3 in February 1984, 3 in March, 1 in April, 3 in May, 11 in June, 12 in July and 1 in August. A total of 15 drawings were never submitted to PCC for review.

*Termination Costs*

BSC's claim of $582,681.69 for costs associated with the termination included $153,656.69 for additional financing costs, and $220,000 for damages to business reputation. Inasmuch as the termination for default was appropriate, and BSC is not entitled to a termination for convenience, it is not necessary to rule upon the validity of these claims.

FINDINGS OF FACT

On December 20, 1985, the parties filed a Memorandum of Stipulations that contained stipulations of facts Nos. 1 through 56. Those stipulations are adopted as findings of fact, and are attached as an Exhibit to this opinion.

57. Boston Shipyard Corporation (BSC) was a small business venture that was incorporated in January 1983. BSC acquired the shipyard facilities in East Boston, Massachusetts, previously owned by the Bethlehem Steel Corporation, and operated by that company from 1922 to October 1982. The shipyard had been modernized during World War II, with facilities and equipment that were designed primarily for repair, overhaul and maintenance of marine vessels and equipment. Arrangements for BSC's ownership of the shipyard were concluded in June 1983. In July 1983, organization of BSC's facilities and personnel was in progress, and a physical inventory of supplies and equipment left over from Bethlehem Steel had not been completed.

58. The president of BSC was J. William Kenney; its Director of Engineering

was Endicott Fay; its general manager from February 1983 to July 1984 was Walter Kaine. In February 1984, BSC hired Hans Frandsen, a master shipbuilder from Denmark, as production manager. BSC's contracts administrator on the PAZ, and on other projects, was James F. Callahan. James F. Callahan also was BSC's quality assurance administrator on the PAZ. In July 1983, BSC had approximately 172 employees. Its total employment increased to a maximum of approximately 400 employees.

59. The Panama Canal Commission (PCC) is an appropriated-fund agency of the United States. Its Storehouse Division, Purchasing and Contracts Branch, is located in Balboa, Republic of Panama.

60. (a) PCC issued Solicitation P–83–8, a formally advertised invitation (IFB) on April 15, 1983, for sealed bids for a firm fixed-price contract on a CIF basis to construct a harbor tugboat in accordance with attached specifications and to deliver the tugboat to a pier in Panama to be designated by the contracting officer. The IFB proposed a contract on standard forms, including Gen.Prov. No. 11, Default, on Standard Form 32 (Rev. 4–75) and Termination for Convenience of the Government (No. 30 in Modifications to S.F. 32). Specification paragraph 1–03, provided for liquidated damages of $1,000 per day of delay; paragraph 1–08 provided for progress payments as a percentage of the contract price at satisfactory completion of designated milestones in the work.

(b) The IFB provided the PCC with the option to purchase one identical additional tugboat at the same price from the time of award through January 31, 1984.

(c) The IFB contained the following requirement:

BIDDER'S EXPERIENCE REQUIREMENT:

The bidder shall furnish written evidence with his bid that he has been successfully engaged in the construction of tugboats similar to the one described in Item No. 1 of this solicitation during the last five years or his bid may be rejected on the basis of nonresponsibility.

61. Bid opening was June 30, 1983; there were 19 bids submitted, five of which were nonresponsive because of currency or bid guarantee qualifications. BSC's bid of $2,055,925 was lowest; the second lowest bid, $2,149,000 was from Eastern Marine, Inc., a small business.

62. PCC designated a two person preaward survey team headed by Enrique Ho W, Storehouse Division, and Hugh E. Harvey. The team made site visits on July 11–12, 1983, at BSC in Boston, and on July 14–15 at Eastern Marine in Panama City, Florida. On July 22, 1983, the preaward survey team reported to the CO that BSC had never constructed a tugboat of any type, that no vessel had been constructed in the shipyard during the 20th century, and recommended that an award should not be made to BSC because BSC did not meet the responsibility requirement. The survey team was of the opinion that an award to BSC would be a "disservice to the struggling firm itself because award may lead into a default situation, thus jeopardizing the firm's future existence as an ongoing venture."

63. On July 29, 1983, the CO, pursuant to 41 U.S.C. § 253(b) (1982) determined that BSC was nonresponsible under the IFB standard, and that Eastern Marine was fully responsible under IFB P–83–8. He decided that the contract "for construction of a harbor tugboat should be awarded to Eastern Marine, Inc., in the bid amount of $2,149,000." On July 29, 1983, the CO forwarded his decision and the reports of the preaward survey team, to the Washington Office of the Small Business Administration (SBA) for review pursuant to 41 C.F.R. § 1–1.708.2 (1982). On August 26, 1983, the SBA certified (Re: Boston Shipyard Corp. and IFB P–83–8) that "the subject small business firm is responsible to perform the proposed procurement covered by the above-referenced solicitation."

64. On September 1, 1983, Hugh E. Harvey was designated COR on site at BSC. Hugh Harvey had 17 years experi-

ence on PCC towboats as a Chief Engineer, and since 1980 he had the title and had occupied the position Chief Engineer-in-Charge, Towboats, Navigation Division. He had attended the Corps of Engineers training course "Contracting Officer Representative" in October 1983, and the Federal Publications Inc. training course "Inspections, Acceptance and Warranties" in November 1983.

65. (a) The COR submitted monthly reports to the CO. The COR report for November 1983 contains information that BSC was 4–5 weeks behind its November 1, 1983, production schedule. The COR report for December 1983, showed that the CO was notified by telephone that BSC was 4–5 weeks behind its own schedule The January 1984 report included a memorandum from R.A. Dickins, PCC Deputy Marine Director, that indicated that as of December 31, 1983, BSC was 5–6 weeks behind schedule. The report also shows that on January 6, 1984, BSC submitted a revised production schedule.

(b) Subsequent COR monthly reports show the following amounts BSC was behind schedule:

| Report | Status | |
|---|---|---|
| February 1984 | 1½–2 | weeks behind BSC schedule |
| March 1984 | 2–3 | weeks behind BSC schedule |
| April 1984 | about 3 | weeks behind BSC schedule |
| May 1984 | 3–4 | weeks behind BSC schedule |
| June 1984 | 3–4 | weeks behind BSC schedule |
| July 1984 | 8–10 | weeks behind BSC schedule |

(not including transit time to Panama)

66. (a) On December 8, 1983, the CO notified BSC that he was quite concerned about the lack of progress in construction of the PAZ because after 105 days into the contract BSC was 4 to 5 weeks behind its own schedule. The letter reminded BSC of the cure notice provision in Gen. Prov. No. 11(a)(ii) and requested by return letter "what steps you will take to get this job back on schedule and keep it there." A copy of this letter was sent to the SBA.

(b) On December 14, 1983, BSC's contract administrator advised the SBA that production was overall behind schedule by approximately 6 weeks, that it was not considered to be critical, and that BSC expected to commence a second shift effort that would result in significant catchup progress in January 1984, so that the PAZ could be launched in May 1984.

(c) On January 5, 1984, BSC's contract administrator notified the CO its revised production schedule provided that erection progress for bulkheads and framing would no longer be tracked on a piece-part/subassembly basis, but rather would be progressed on a modular completion basis: Bow, Midbody, and Stern modules. The letter also stated that BSC was 112 mandays behind its original schedule, and that BSC's calculations from its manpower curve equated the 112 mandays to 4 working days behind schedule. The letter advised that, to preclude future misunderstandings about status, the COR had been requested informally to confine inquiries to the contract administrator and the BSC chief engineer.

67. (a) On January 5, 1984, PCC's Deputy Marine Director R.A. Dickins wrote a memo for record on his visits to BSC on November 22–23 and December 28–29, 1983. The December visit showed BSC had fallen further behind schedule, and that unless progress in the month of January was significant the PCC would be faced with the difficult decision as to whether "the yard has demonstrated sufficient progress to convince us that we should exercise our option for a second tug."

(b) The CO visited BSC on January 31, 1984, to determine firsthand whether to exercise the option for an additional tug. He found that the PAZ was substantially behind BSC's production and material schedules and decided not to exercise the option for an additional tugboat from BSC. BSC's president was advised at the meeting that the option would not be exercised.

68. (a) The April 18, 1984, cure notice to BSC identified events that led the CO to believe that timely completion of the PAZ was beyond reach: (1) At the January 31, 1984, meeting, BSC presented a revised production schedule that provided for ac-

tions in February, March, and April that would allow the PAZ to be completed on schedule; (2) On February 29, 1984, the COR reported BSC was 1½ weeks behind schedule and BSC's new production manager had asserted BSC would have the PAZ completed and in Panama by July 1, 1984; and (3) A March 6–8, 1984, inspection by PCC's Deputy Marine Director disclosed that the PAZ was 1 to 2 weeks behind schedule. The notice directed BSC to accelerate progress so as to assure timely completion, provide a detailed work plan for bringing production on schedule, identify a firm date for launching the PAZ, and provide proof of payment for the main engines and other equipment.

(b) On May 8, 1984, BSC's contract administrator responded: (1) That BSC had revised its capital equipment delivery in a way that would alleviate financial strain but would still "maintain the completion date as contracted"; (2) That BSC considered the tug "is on schedule" and that the July 1, 1984, delivery date was not a firm commitment by the project manager; (3) BSC's work plan would meet critical scheduling problems and provide the necessary resources to overcome bottlenecks in production. The letter stated "BSC has not changed delivery date", that the PAZ would be transferred to drydock during the week of May 28, 1984, and launched for trials during the first week of July 1984.

(c) On June 1, 1984, the CO advised BSC that he had "decided not to terminate the contract at this time." He emphasized that BSC must "adhere to the corrective measures outlined in your letter."

69. During an inspection visit on June 25–26, 1984, by D.B. Flanagan, Assistant Chief of PCC Navigation Division, a number of construction deficiencies were observed and discussed with the COR. BSC's plan to attempt to launch the PAZ on June 27, 1984, was examined and was considered to be feasible, but risky, and with ample opportunity for damage. The COR was requested to rent video tape equipment in order to record the operation with detailed accuracy. The trip report says such a record "may be of great value to our attorneys."

70. On June 28, 1984, BSC's contract administrator by letter requested the COR to refrain immediately from conversing or conducting any kind of dialogue with the BSC craftsmen and tradesmen. This was the first complaint BSC had made in writing with respect to contracts by the COR with BSC employees or tradesmen. BSC's contract administrator testified he had no firsthand knowledge of the COR giving directions to BSC personnel. He also testified that his function as contract administrator was to serve as a conduit in communications with PCC, that letters he signed were the product of various other departments in BSC and that he had signed the May 8, 1984, letter to the CO at the direction of BSC's president.

71. (a) After failure in its attempt to move the PAZ, on July 8, 1984, BSC requested John W. Gilbert Associates, Inc., an independent consulting firm of naval architects and consulting engineers, to inspect and report on the structural integrity of the hull girder with the absence of a skeg. The inspection was made July 9, 1984, by a team that included John W. Gilbert, Robert Hill from the Boston office of the firm, and BSC's chief engineer, Endicott Fay.

(b) The Gilbert report, submitted on July 16, 1984, was prepared in the Boston office of the firm. The report stated that the vessel had significant operational deficiencies, that longitudinal strength and structure continuity had been compromised, and that maneuvering characteristics would be compromised, with resulting poor directional stability. The "most dangerous and potentially catastrophic problem" could arise during drydocking and the only solution to such concerns "would be to add a skeg."

(c) Mr. Gilbert testified that drydocking problems were his main concern and that the PAZ could be placed in drydock without a skeg, if proper preparation was made for drydocking operations. When the PAZ was inspected it was supported by a strong

**166**

cradle and could be moved safely in that cradle.

72. During the period from June 27, 1984, through July 8, 1984, BSC did not perform substantial amounts of work on the PAZ. The CO called a meeting for July 17, 1984, to determine if PCC could assist BSC and whether timely delivery could be realized. The meeting on July 17, 1984, was attended by J. William Kenney and Endicott Fay for BSC and by Messrs. Corrigan, Harvey, Munchback and Flanagan for PCC. There were three meetings: a morning session attended by all participants, a private meeting between J. William Kenney and John P. Corrigan, and an afternoon session attended by all participants.

73. The following transactions and statements occurred at the July 17, 1984, meeting:

1. BSC's president presented three documents to the contracting officer: (a) a letter opinion from a naval architect, John W. Gilbert Associates, Inc., (b) an unsigned document that contained allegations and argument that would apply to an equitable adjustment, under three topic headings: Availability of Plans, As-Constructed Plans, and Plan Approval; and (c) a telex from Michigan Wheel Corporation, the manufacturer of the towmaster rudder system, relative to inadequate performance specifications.

2. PCC presented a list of problems that had arisen in construction to date, which all parties agreed could be corrected.

3. Plaintiff's president discussed financing difficulties, and the need for progress payments, to provide the cash flow necessary to move the PAZ and to complete construction. Arrangements were made for the contracting officer to approve partial progress payment No. 5 for $345,879.51 so that work could continue.

4. Plaintiff's president complained to the contracting officer about interference and disruption caused by the COR. These complaints, and the allegations in the unsigned document in (b), were not accompanied by or associated with requests for time extensions.

5. Plaintiff's president, on the basis of the naval architect's letter in (a), asserted the design of the PAZ without a skeg was defective, and that the vessel was structurally unsound, unseaworthy, and liable to damage in drydock and on the seas en route to Panama. He requested the contracting officer to have an analysis made of the need for a skeg. PCC's representatives contended the original design was adequate and the PAZ would be structurally sound and seaworthy without a skeg. The contracting officer agreed to have the American Bureau of Shipping (ABSTECH) review the PAZ for structural integrity without a skeg. The contracting officer told BSC that his experts, including ABSTECH, did not feel the structure was inadequate, and that the PAZ could be moved safely. The contracting officer reiterated that BSC was responsible for timely delivery of the PAZ.

74. ABSTECH requested the consulting firm of CT Marine, naval architects and marine engineers, to review the contract drawings and to give an opinion on the need for a skeg on the PAZ. On July 21, 1984, CT Marine prepared a document captioned: A Review of the Pros and Cons of Fitting a Centerline Skeg on the Tug "PAZ". This report was not based on calculations. The report stated that, as to the longitudinal strength of the vessel, it was doubtful that there could be any marked difference to the bending stress with or without a skeg. The strength of the tug would not be in jeopardy if a skeg were not fitted. Docking without a skeg would require elaborate cribbing and could require special storage facilities for fuel oil or other consumables. The report recommended the fitting of a small skeg to help reduce local loads while drydocking.

75. PCC on July 17, 1984, requested ABSTECH to review the PAZ for structural integrity without a skeg in order to verify or disclaim the findings in the July

16, 1984, Gilbert report. On August 1, 1984, ABSTECH prepared a report, signed by Robert W. Pinard, on the results of its study. The ABSTECH report consists essentially of a verbatim copy of the CT Marine report.

76. (a) On July 25, 1984, the COR learned in a telephone conversation that the ABSTECH report would conclude that the PAZ was structurally sound without a skeg. This information was given to the contracting officer by telephone.

(b) On August 1, 1984, the COR obtained the written report of ABSTECH, dated August 1, 1984, on the pros and cons of fitting a centerline skeg. The COR obtained on August 2, 1984, a copy of the CT Marine report, dated July 21, 1984.

(c) On August 3, 1984, the COR, by telephone, informed BSC that ABSTECH had reported the PAZ was structurally sound without a skeg. The COR, on instructions from the contracting officer, did not mention to BSC that ABSTECH and CT Marine in their reports had recommended that a skeg be added for ease in drydocking.

77. An unsigned position paper was delivered by BSC to the CO at the July 17, 1984, meeting. It contained allegations and argument that would apply to an equitable adjustment under the headings: Availability of Plans, As-Constructed Plans, and Plan Approval. This paper was discussed in the context of BSC's financial needs. No request was made at the meeting for an extension of the delivery date. The position paper lacked detail and supporting information. It does not satisfy the requirements for a formal claim for an equitable adjustment. It was not presented as an informal request for more time.

78. A letter dated August 2, 1984, from BSC to the CO was received on August 7, 1984. This letter gave notice of BSC's intent to submit a claim for an equitable adjustment in the following areas: Additional Plan Work; Defective Performance Requirements; Constructive Change Orders; and Addition or Absence of a Skeg. This communication lacked specific detail about the subject areas, did not include documentary support, and lacked backup financial information. The August 2, 1984, letter does not satisfy the formal requirements of a claim for an equitable adjustment.

79. (a) On January 18, 1985, P.W. Wilson, Marine Surveyor, commenced a survey of the PAZ in the Boiler Shop for a report on its general status of construction. When the survey was conducted, the surveyor was not told that the contract had been terminated in August 1984. The survey established the status of construction at the time of the survey; the surveyor did not know how much, if any, work had been done between the termination date and the survey date.

(b) The P.W. Wilson report, dated February 8, 1985, dealt comprehensively with various elements in the PAZ construction. The construction status summary finding stated:

CONSTRUCTION STATUS: Overall hull structure is considered to be about 85 percent complete. Machinery installation is estimated to be about 35 percent complete. Workmanship, fitting and welding, piping, wiring, outfitting, is considered to be to good marine standards and in compliance with contract drawings.

The final conclusion of the surveyor as to state of completion was that the PAZ "is approximately 80 percent complete."

80. (a) ABSTECH's report for the period July 1 through July 31, 1984, noted that the PAZ construction was "in the stage where little more can be accomplished until she is transported outside and floated."

(b) The report contains estimates of the state of completion under the following topics: Hull Progress of Steel Erection; Machinery Progress of Production; Piping Progress of Production; Electrical Progress of Production; and Miscellaneous Progress of Production. Estimates of completion of various elements ranged from 100 percent (vents and sandings) to 10 percent (insulation).

(c) Transport of the hull to a location outside the Boiler Shop was estimated in the report at 10 weeks behind schedule. Installation of the deckhouse was estimated at 6 weeks behind schedule. The reported noted that auxiliary engines had not been delivered.

81. BSC submitted its formal claim on February 28, 1985. The elements of the claim, as summarized by BSC, are:

1. Amount Due Under Contract, as Amended (without equitable adjustments)

| | | |
|---|---|---:|
| | Contract Price: | $2,115,189.00 |
| | Percentage of Completion: | 80% |
| | Total: | $1,692,151.20 |
| 2. | Equitable Adjustments | |
| | Labor and Material: | 335,617.00 |
| | Profit (10%) | 33,561.70 |
| | Total: | 369,178.70 |
| 3. | Termination Costs | 582,681.69 |
| | TOTAL | $2,644,011.59 |
| | LESS PROGRESS PAYMENTS RECEIVED | 759,818.01 |
| | NET CLAIM | $1,884,193.58 |

82. BSC requested equitable adjustments for additional time as follows:

| | | |
|---|---|---|
| Availability of Plans | - | 30 days |
| Plan Approval | - | 30 days |
| Plan Development | - | 40 days |
| Constructive Changes | - | 30 days |

83. BSC's claim in money for equitable adjustments is summarized as follows:

| | | | |
|---|---|---|---:|
| 1. | Plan Development | | |
| | Engineering Hours | 1580 @ 26.75 | 42,265.00 |
| | Craft Hours | 3230 @ 26.75 | 86,402.50 |
| | Materials | | 8,498.00 |
| | | | 137,165.50 |
| 2. | Plan Approval | | |
| | Craft Hours | 4996 @ 26.75 | 133,643.00 |
| 3. | Performance | | N/C |
| 4. | Constructive Changes: | | |
| | Engineering Hours | 189 @ 26.75 | 5,055.75 |
| | Craft Hours | 1349 @ 26.75 | 38,172.25 |
| | Materials | | 5,903.00 |
| | | | 49,131.00 |
| 5. | Skeg | | |
| | Engineering Hours | 80 @ 26.75 | 2,140.00 |
| | Craft Hours | 450 @ 26.75 | 12,037.50 |
| | Materials | | 1,500.00 |
| | | | 15,677.50 |
| | TOTAL | | |
| | LABOR HOURS | 11952 @ 26.75 | 319,716.00 |
| | MATERIAL | | 15,901.00 |
| | | | 335,617.00 |

84. BSC's claim for termination costs included:

| | |
|---|---:|
| Preserving Materials & Equipment, 8 mos. storage | 209,025.00 |
| Cost of Money (1 year at 12 percent interest) | 153,656.69 |
| Damages to Reputation | 220,000.00 |
| TOTAL | $582,681.69 |

85. The following table sets forth the drawings included in BSC's claim for equitable adjustment for plan development, and the dates the drawings were submitted for approval.

| Drawing | Submitted |
|---|---|
| 83–01–22 Bilge & Ballast System | 6/29/84 |
| 83–01–23 Fuel Oil Piping (PCC No. 80–300) | 6/29/84 |
| 83–01–25 Lube Oil & Waste Oil Piping | 5/21/84 |
| 83–01–26 Service Air Piping | 7/12/84 |
| 83–01–27 Fire System Piping | 6/29/84 |
| 83–01–28 Exhaust System Piping | 6/06/84 |
| 83–01–47 Potable Water & Sanitary | 7/09/84 |
| 83–01–48 Sanitary Drain Piping | 5/21/84 |

86. Equitable adjustments for claimed constructive changes —COR interference included the following items:

Main Engine Raw Water System
Potable Water & Sanitary System
Fuel Oil System
Bilge & Ballast System
Electrical Systems
Propeller Shaft
Compressed Air Piping

| | | |
|---|---|---|
| TOTAL CLAIM | Delay: 30 days | $49,131.00 |

87. On August 4, 1984, the PAZ was from 70 to 80 percent completed. BSC would have required an additional 7 or 8 weeks to complete and deliver the PAZ.

88. (a) As of August 4, 1984, BSC had not submitted requests for equitable adjustments relative to the items that were claimed in its February 28, 1985, submission. As of that date, BSC had not requested formally or informally any extensions of time to meet the delivery date.

(b) BSC has no records or other supporting materials that reflect the impact of the specific acts alleged in terms of delay and cost. In addition to an absence of accounting or other documentary support relative to the effects of specific acts of the Government, documents in the record contemporaneous with the events cited do not accord with the allegations made in plaintiff's February 28, 1985, formal claim. BSC did not raise these matters as an excuse for its nonperformance, until the July 17, 1984, meeting.

89. BSC's claim was audited by the Defense Contract Audit Agency. The audit report, dated January 14, 1986, contains the following analysis of the equitable adjustments claimed by BSC:

| Element of Claim | Amount Claimed | Questioned Costs Unsupported | |
|---|---|---|---|
| Plan Approval Delays | $133,643 | $133,643 | (a) |
| Performance Requirement | 0 | 0 | |
| Plan Development— Additional | 137,165 | 137,165 | (b) |
| Constructive Changes | 49,131 | 49,131 | (b) |
| Skeg Omission | 15,678 | 15,678 | (b) |
| Subtotal | $335,617 | $335,617 | |
| 10% profit | 33,561 | 33,561 | (c) |
| TOTAL | $369,178 | $369,178 | |

(a) The contractor states that plan approval delays "caused significant delays and disruption in production." Disruption manhours are calculated as 20% of total production manhours (24,980 m/hrs). Both total production and disruption manhours are engineering estimates and are unsupported.

(b) These costs are material and labor engineering estimates and are not supported in the contractor's accounting records.

(c) We have cost questioned the profit applicable to the equitable adjustments cost questioned.

90. The audit report contained the following analysis of BSC's claimed termination costs.

| Element of Claim | Amount Claimed | Questioned Costs Unsupported |
|---|---|---|
| Storing & Preserving Material & Equipment | $209,025 | $209,025 |
| Cost of Money | 153,657 | 153,657 |
| Damages (Reputation) | 220,000 | 220,000 |
| TOTAL | $582,682 | $582,682 |

These costs are engineering and/or financial estimates and are unsupported by the contractor.

91. The Bollinger Machine Shop & Shipyard, Inc. built the tugboats ALIANZA, PROGRESSO and AMISTAD in 1981–82. The construction time and cost to build were:

|          | MANHOURS  | COST          |
|----------|-----------|---------------|
| ALIANZA  | 50,746    | $2,805,619    |
| PROGRESSO| 45,595.13 | $2,793,790.55 |
| AMISTAD  | 44,912.63 | $2,749,196.29 |

Bollinger's bid in response to the IFB for the PAZ was $2,869,991.01.

## CONCLUSION

■ On the basis of the foregoing opinion and findings of fact, the termination for default was a proper exercise of the authority contained in the default clause, Gen. Prov. No. 11. Plaintiff has not shown that it is entitled to have the termination converted to a termination for convenience of the Government. The May 6, 1985, decision of the contracting officer on plaintiff's claims was correct. The Clerk is directed to dismiss the complaints. Defendant is entitled to recover $759,819.01 on its counterclaim. The Clerk is to enter judgment to that effect. Defendant may recover its costs.

## MEMORANDUM RE STIPULATIONS

The parties hereby stipulate to the following:

## STIPULATIONS OF FACTS

1. The Panama Canal Commission ("PCC") awarded Contract No. PC-lp–1544 ("the Contract") for the construction of a harbor tug to Boston Shipyard Corporation ("BSC") on August 26, 1983 and notice of award was sent on August 29, 1983. The vessel was to be called the "PAZ".

2. The original contract price was $2,055,000. Subsequent contract modifications raised the contract price to $2,115,189.

3. The 330 days provided in the contract for BSC to construct and deliver the tugboat began on September 9, 1983.

4. The delivery date for the vessel stated in the Contract was August 4, 1984.

5. The PCC's Contracting Officer for the Contract was Richard D. Morgan from the time of award until January 15, 1984, at which time John P. Corrigan III became Contracting Officer.

6. The Contracting Officer's Representative ("COR") assigned to the Contract on site at BSC was Hugh Harvey.

7. Twenty-four guidance drawings were provided to all bidders including BSC prior to award of the contract. The contract required the PCC to provide BSC with additional guidance drawings. The drawings provided by the PCC were sent to Boston on September 16, 1983 and arrived at BSC on or about September 29, 1983.

8. BSC sent the PCC a telex on September 9, 1983, advising the PCC that it had not received the additional guidance drawings and advising the PCC that work could not commence until those drawings were received. On September 16, 1983, the PCC sent BSC a total of 25 guidance drawings. Of these, six were not drawings listed in the contract, but substitutes which the PCC contends were updated versions which cover the subject matter of the eight drawings listed below. The following eight drawings listed in the contract were never provided by the PCC to BSC

| | |
|--------|-------------------------------------------|
| 80–276 | Transverse Frames 36 through 47           |
| 80–296 | General Alarm System                      |
| 80–317 | Sea Chest Details                         |
| 80–321 | Lube Oil, Waste Oil and Compressed Air Piping |
| 80–396 | Exhaust Piping                            |
| 80–10  | Jockey Bar Assembly and Details           |
| 80–44  | Louver details                            |
| 80–102 | Docking Plan                              |

9. The piping drawings provided by the PCC were diagrammatic drawings which showed the general location of the piping within the subdivisions of the vessel. They did not show the actual location of piping on the ALIANZA, AMISTAD or PROGRESSO.

10. The contract required the BSC to construct the tug in accordance with both the written specifications and the guidance drawings. In the event of a conflict between the specifications and the drawings, the specifications controlled.

11. The contract required working drawings prepared by BSC to be submitted to the Contracting Officer for approval and if not disapproved by the Contracting Offi-

cer within 14 days after receipt by the Contracting Officer such plans would be deemed approved.

12. At the time of his appointment as Contracting Officer's Representative, Hugh Harvey had no experience in vessel construction and had not previously served as a COR on any government contract.

13. At the time of his appointment as Contracting Officer on the Contract, John P. Corrigan III had no experience in vessel construction and had not served as a Contracting Officer on any vessel construction project.

14. In a Memorandum dated June 18, 1984, the COR indicated the location of the main engine raw water discharge, which had already been installed, should be above the waterline and he contended that its installed location was six inches below the waterline. The discharge had in fact been installed at the vessel's waterline and this installation was in accordance with BSC drawing number 83–01–21 which had been submitted to the PCC on March 16, 1984, and for which no response disapproving the drawing had been received. BSC therefore requested a contract modification to do the work requested by the COR which change was disapproved by the COR. BSC subsequently moved the location of the main engine raw water discharge to a point six inches higher. PCC contends that the drawing and installation were not in accordance within the Contract and that BSC agreed to install all discharges above the waterline.

15. A skeg is a vertical fin on the hull of the vessel, usually in the stern. Some vessels are fitted with skegs to assist in supporting the stern of the vessel during drydocking.

16. The Contract called for the tug being constructed by BSC to have no skeg.

17. Each of the previous similar-design tugs constructed for the Panama Canal Commission by Bollinger Machine Shop & Shipyard, Inc., upon which the guidance plans for the tug being constructed at BSC were based, had a large centerline skeg running aft from the base of the keel to frame 48.

18. The guidance plans provided to BSC prior to award of the contract showed the skeg eliminated from the hull of the vessel.

19. The Commission has no record of a written internal or independent external opinion on the elimination of the skeg prior to issuance of the Specifications for Contract PC-lp-1544, although PCC naval architect Harlett R. Stiles recalls having prepared one which the PCC is unable to locate.

20. At the time the Commission issued the Specifications for Contract PC-lp-1544, the Marine Bureau intended to request that the skeg be removed from the ALIANZA. The purpose of the proposed elimination was to increase vessel maneuverability.

21. After award of the Contract, the PCC's Navigation Division requested the Industrial Division to cut off the skeg from the tugboat ALIANZA (constructed by Bollinger), but the Industrial Division suggested modifying rather than eliminating the skeg and instead cut lighting holes into it to increase manueverability. The PCC did not inform BSC at the time the skeg was modified that the skeg had been retained on the ALIANZA.

22. In April 1984, Hugh Harvey returned to Boston from Panama with pictures of the ALIANZA in drydock which showed that the skeg had not been eliminated from the ALIANZA but had only been modified.

23. Under Boston Shipyard's plan of construction, in order to complete construction of the tugboat being constructed by BSC it was necessary to move the hull out of the Boiler Shop to a drydock outdoors so that heavy equipment such as the main engines could be installed and the deckhouse could be attached to the hull of the vessel.

24. On June 27, 1984, an attempt was made to move the hull from the Boiler Shop on rollers. The hull settled to the stern and crushed the rollers under the aftermost point of the base of the keel.

25. In late June or early July 1984, BSC requested a formal opinion from naval architect John W. Gilbert as to whether a skeg should be added to the vessel.

26. On July 17, 1984, at a meeting at BSC, BSC President J. William Kenney provided a copy of the Gilbert opinion on the absence of a skeg to the Contracting Officer.

27. BSC was not provided with a copy of the ABSTECH report prior to termination of the contract.

28. On July 24, 1984, the PCC made a progress payment of $345,879.51 to BSC, bringing the total progress payments made to $759,819.01.

29. On August 3, 1984, the Contracting Officer authorized the COR to tell BSC that in ABSTECH's opinion the vessel was structurally sound without a skeg. The CO did not authorize the COR to state that the ABSTECH report also recommended the addition of a small docking skeg and the COR did not inform BSC of this recommendation.

30. On August 6, 1984, the Contracting Officer terminated the contract for default.

31. Subsequent to the termination of the Contract, the Commission issued a re-procurement solicitation for completion of the vessel by another yard. This solicitation included essentially the same specifications as the 1983 solicitation for the tug. After abandonment of the reprocurement solicitation for completion of the vessel at another yard, the Commission issued a reprocurement solicitation for the complete construction of the vessel at another yard which provided for the inclusion of a "suitable docking support structure" at the contractor's option, subject to the Contracting Officer's approval. This contract was awarded to Twin City Shipyard, Inc., with delivery due on December 14, 1985.

32. On August 2, 1984, the Commission awarded a contract to Houma Fabricators, Inc. for the construction of a tugboat named the ESPERANZA which was essentially identical to the tugboat being constructed for the Commission by BSC for a price of $2,482,800, to be delivered July 15, 1985. On November 1, 1984, the COR verbally conveyed approval of the Contracting Officer to permit the inclusion of a docking skeg on the ESPERANZA.

33. Drydocking a vessel in the PCC Synchrolift at Cristobal, Panama requires essentially the same blocking of the vessel as a conventional floating or graving drydock.

34. At the time the Contract was terminated the COR estimated the project was seven to nine weeks behind schedule.

35. The PCC conducted a pre-award survey of the BSC facility on July 11 and 12, 1983.

36. The PCC found BSC not to be a responsible bidder because of BSC's lack of experience in building tugboats in the last five years as required in the invitation for bids.

37. The PCC awarded the contract to BSC after the Small Business Administration ("SBA") issued a certificate of competency to BSC.

38. Hugh Harvey was the PCC Contracting Officer's Representative ("COR") on site at BSC. The PAZ contract was Mr. Harvey's first experience as a COR.

39. BSC built the tugboat hull inside a shed 200 feet from where the hull could be launched.

40. BSC fabricated the cradle and laid the keel during the first week in October 1983. By the end of the first week in October BSC had completed sufficient work to earn the five percent progress payment provided in the progress payment section of the contract.

41. PCC contracted with the American Bureau of Shipping Worldwide Technical Services, Inc. ("ABSTECH") to provide technical assistance to the COR in connection with the construction of the tugboat and to prepare and submit monthly progress reports to the COR.

42. The ABSTECH representatives were Robert Pinard and Stephen Kovacs.

43. The contract specification stated that the hull would not have a skeg. A skeg is an extension of the centerline keel.

44. BSC had never built any vessel before they bid on the Tugboat PAZ contract.

45. BSC estimated at the time it bid for the PAZ contract that it could build the tugboat for approximately $1.8 million and complete the contract in approximately 30,-000 manhours.

46. BSC was required to provide progress reports to the Panama Canal Commission indicating BSC's progress and goals for completion of the tugboat. These schedules were revised at least four times before the contract was terminated for default.

47. To complete the tugboat, BSC had to move the hull from the shed in which it was being constructed into the water. BSC did not move the hull into the water before the contract was terminated.

48. The tugboat was not delivered by the date specified in the Contract.

49. On December 8, 1983, Mr. Morgan, the PCC contracting officer, wrote to BSC expressing his concern about BSC's lack of progress in the construction of the tugboat.

50. Mr. Corrigan, the contracting officer who succeeded Mr. Morgan on January 15, 1984, issued a cure notice on April 18, 1984, advising BSC that the contract would be terminated for default for lack of progress unless BSC was able to demonstrate that it had the capability of completing the tugboat in a timely manner. BSC responded to this cure notice on May 8 by indicating it would take steps to increase production as outlined in the letter. The CO did not terminate the contract for lack of progress pursuant to the April 18th cure notice and issued no other cure notice prior to terminating the contract for default.

51. Mr. Corrigan requested ABSTECH to review Mr. Gilbert's opinion regarding the necessity of a skeg on the tugboat.

52. The contract was terminated for default on August 6, 1984.

53. In April of 1984, Mr. Harvey presented pictures to employees of Boston Shipyard indicating that the skeg on the ALIANZA Class vessels had been modified but not eliminated.

54. As of July 17, 1984, BSC could not have delivered the tugboat by August 4, 1984, the date specified in the Contract.

55. BSC never requested in writing a contract modification permitting them to construct a skeg on the hull.

56. Exhibit 4 to the Certified Claim filed by BSC was prepared by Hans Frandsen.