UNIVERSAL FIBERGLASS
CORPORATION

v.

The UNITED STATES.

No. 85–70.

United States Court of Claims.

June 16, 1976.

See also, Ct.Cl., 537 F.2d 400.

Karen E. Hakel, Washington, D. C., for plaintiff. Rocco J. Russo, Cleveland, Ohio, atty. of record.

Michael J. Rubin, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant.

Before SKELTON, NICHOLS and KASHIWA, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge:

This a contract action wherein this court, by cross motions for summary judgment, has been asked to review a decision of the General Services Administration (GSA) Board of Contract Appeals (Board), 71–1 BCA ¶ 8901, in accordance with the standards of the Wunderlich Act, 41 U.S.C. Secs. 321–22 (1970). Defendant has counterclaimed for $2,363,508.04, plus interest. Trial Judge Bernhardt has submitted a rec-ommended decision and conclusion of law in accordance with Rule 166(c). We agree with the result as to the main question, the termination for default, but arrive at it for different reasons. We differ as to his disposition of the counterclaims.

### I.

On August 31, 1964, the Government solicited bids for the purchase of 12,714 mailsters (small 3-wheel mail delivery trucks). The original delivery schedule, as amended by Special Notice No. 1 to Prospective Bidders, called for the contractor to have a pilot model available for inspection not later than June 27, 1965, and to achieve a production rate of 75 units per day by July 27, 1965. Universal Fiberglass Corporation (UFC), the plaintiff, was the lowest bidder; however, representatives of the GSA were reluctant to award it the contract because of concern over its ability to perform. On the basis of the Small Business Administration's certification of competency, the GSA awarded the contract to UFC on January 27, 1965. After the contract was awarded to UFC, the Government repeatedly warned the contractor that failure to meet the delivery schedule would be grounds for termination of the contract.

On April 14, 1965, the Government accepted the pilot model, but plaintiff was unable to deliver any vehicles by July 27, 1965. In fact, plaintiff did not have the parts nor a delivery schedule of parts from suppliers to enable it to produce 75 mailsters per day and would not have been able so to produce until December 1965. The Government, in a memorandum dated October 29, 1965, formalized an Amendment No. 2 to the contract on November 29, 1965, agreeing to a time extension excusing 90 days of delay from July 27, 1965. A "final revised delivery" schedule was accepted as proposed by the contractor which called for a gradual increase in the rate of production and established "benchmarks" of delivery achievement:

December 24, 1965 _____ 30 vehicles per day
January 7, 1966 _____ 52 vehicles per day
January 21, 1966 _____ 75 vehicles per day

By December 24, 1965, the first "benchmark" had not been reached. Although 366 acceptable vehicles should have been delivered by December 28, 1965, only 127 had in fact been accepted. On January 28, 1966, the parties agreed to another time extension as follows:

March 16, 1966 _____ 30 vehicles per day
March 28, 1966 _____ 52 vehicles per day
April 11, 1966 _____ 75 vehicles per day

Plaintiff was unable to meet the revised schedule and the Government then agreed to yet another adjustment:

April 21, 1966 _____ 30 vehicles per day
May 3, 1966 _____ 52 vehicles per day
May 17, 1966 _____ 75 vehicles per day

On April 8, 1966, a fire partially destroyed portions of plaintiff's plant. The April 21, 1966, "benchmark" was not fully met; however, the contractor was resuming production and supplied the Government with approximately twenty vehicles per day by April 28, 1966. As of that date, plaintiff had 208 vehicles in various stages of production.

During 1966, many of the vehicles delivered were deficient. The repair facilities were inadequate, despite the Government's repeated demands upon plaintiff to provide repairs in accordance with the contract.

In May 1966, negotiations ensued between all parties to determine the precise nature of necessary specifications changes, the price adjustment and possible extensions of the delivery schedule. On August 9, 1966, Amendment No. 4 was executed which changed the specifications to include certain safety features in compliance with the new Federal Safety Standards. All vehicles produced after September 27, 1966, were to have these new features, which included a four wheel instead of a three wheel design, requiring the scrapping of many parts. The Amendment required the contractor to furnish the contracting officer with a revised delivery schedule no later than October 1, 1966.

A pilot model incorporating the Amendment No. 4 changes was conditionally approved by the Government on September 30, 1966. The Government was doubtful about plaintiff's ability to perform the contract, however, because of an audit performed by a Government accountant which concluded that plaintiff was insolvent.

Plaintiff was unable to furnish a revised delivery schedule by October 1, 1966. It had informed the Government of its difficulties in obtaining the component parts required by Amendment 4. On October 1, the Government asked plaintiff to furnish its proposed revised delivery schedule and advised plaintiff that the responsibility for securing the necessary parts was the plaintiff's. On October 12, 1966, the Government again requested immediate submission of a revised delivery schedule.

On November 1, 1966, the Commissioner of the Federal Supply Service wrote the plaintiff, citing the results of the September audit and asked the plaintiff to furnish a detailed arrangement for completion of the contract. Plaintiff responded by letter of November 14, 1966, alleging that the Government was responsible for its increased costs and that the contract might be impossible to perform.

Plaintiff was forced virtually to close down its production lines in the plant after September 27, 1966, and to lay off most of its labor force. As of September 27, 1966, plaintiff had a production force of about 220. Plaintiff's records indicate an expenditure of $82,140 for hourly and salaried employees during the 2 months preceding termination on December 2, 1966. Some of this activity consisted of ordered and expediting parts. Other activity consisted of processing 44 vehicles manufactured under the old specifications before September 27, 1966, for delivery to the Government. Towards the end of October plaintiff briefly restarted production line in an effort to complete 11 vehicles under the new specifications, but the lack of required parts prevented their completion. During October 1966, plaintiff continued on a reduced scale

the manufacture of fiberglass bodies for the vehicle, but thereafter this too was discontinued. The plaintiff's records reflect that during the first half of November 1966, plaintiff had 24 hourly employees who worked a total of 1,134¾ manhours on various days, and in the last half of November it had 19 hourly employees who worked a total of 1,112¾ manhours on various days. No vehicles were ever produced by plaintiff under the new specifications imposed by Amendment No. 4, except a pilot model. Plaintiff had stopped production and would have had great difficulty in continuing the contract. Plaintiff had lost $1,400,000 on the contract by March 31, 1966, and would have sustained an even greater loss had the contract been completed. The Government understood that several parts suppliers were refusing plaintiff's orders because of its poor financial condition. Plaintiff was not ready, willing and able to perform the contract because of its inadequate financial condition.

As of November 30, 1966, plaintiff had not manufactured any vehicles incorporating the new safety standards. On that date, the Government issued a Preliminary Notice of Default which gave plaintiff ten days to cure all of its defaults. Plaintiff, by letter dated December 1, 1966, waived its rights to the full ten day notice period. The contract was terminated for default on December 2, 1966, for the following reasons: (1) Failure to deliver, (2) Failure to make progress, (3) Failure to comply with provisions of the Progress Payments Clause, and (4) Failure to comply with the Warranty Clause.

Plaintiff appealed the termination to the GSA Board. The first appeal was on the limited issue of whether the right to terminate for failure to deliver had been waived. On July 7, 1969, the Board found that the Government, by its conduct, had waived the delivery schedule up to October 12, 1966. 69–2 BCA ¶ 7780.

Plaintiff thereupon moved the Board to set aside the default termination. The Board determined that a hearing was necessary on the factual question of "whether the Government waited a reasonable time for delivery of mailsters to be produced under the revised specifications." 70–2 BCA ¶ 8440. On March 6, 1970, plaintiff filed a petition in this court. By order of February 17, 1971, the court stayed its proceedings pending administrative resolution of the remaining issues.

The Board held hearings on April 6, 7, 8 and 12, 1971, and then on May 28, 1971, issued its decision upholding the default termination. 71–1 BCA ¶ 8901. The Board found that "based on the entire record, including prior performance * * *, performance and production capacity, financial condition of the [plaintiff] at the time of termination, and [plaintiff's] waiver of the ten day notice, * * * the Contracting Officer was justified in declaring [plaintiff] in default."

Our trial judge has concluded that the Board's affirmation of the contract termination was not supported by substantial evidence with respect to failure to deliver and to make progress but was supported by substantial evidence with respect to the non-compliance with progress payments provisions and the breach of warranty grounds. For the reasons discussed below, we think that plaintiff clearly was properly terminated for failure to make progress and therefore we need not and do not consider the propriety of the other listed grounds for termination, which are not so clear, but do not affect the result.

## II.

The Default Clause of this contract reads, in pertinent part as follows:

11. Default

(a) The Government may, subject to the provisions of paragraph (c) below, by written notice of default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances:

(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or

(ii) if the Contractor fails to perform any of the other provisions of this contract, *or so fails to make progress as to endanger performance of this contract in accordance with its terms,* and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure. (Emphasis supplied).

The Board's enumeration of reasons supporting a finding of "failure to make progress, a listed basis for default," included "lack of production, inadequate financial condition, failure to correct warranty defects, submittal of excessive and improper progress payment vouchers, general lack of production 'know-how', failure to state adequate delivery schedule, and waiver of the ten-day cure notice." These reasons are identical to those assigned by the Board to support failure to deliver as a companion ground of termination.

■ On October 12, 1966, the contracting officer asked the contractor to submit a revised delivery schedule. The Board concluded that this constituted a waiver of plaintiff's failure to deliver by that date. The contracting officer obviously contemplated that the plaintiff would deliver at some time; to deliver, the plaintiff would have to make progress. The waiver, although specifically only to delivery, impliedly waived plaintiff's failure to "progress [so] as to endanger performance of the contract." The contracting officer recognized that progress would be delayed somewhat, although he did not expect that it would be abandoned. The October 12, 1966, letter was probably not intended by the contracting officer to be a waiver of default for non-delivery even though the Board found, and we agree, that it operated to that effect. Still less was it intended as a waiver of the failure to make progress, obviously. It was more in the nature of a warning that such failure was not unnoticed.

■ The trial judge found that failure to progress cannot be measured by plaintiff's actions prior to the October 12, 1966, waiver. However, if conditions resulting from these actions continued after the waiver date uncorrected, the mere fact that the contracting officer was on October 12, aware of plaintiff's problems does not bar a later termination. Plaintiff's actions, before October 12, indicate a pattern of nonperformance and delay which should not be ignored. Although not justifications for default in themselves, they provide a context for understanding and evaluating plaintiff's continued problems. Moreover, the contracting officer could still terminate plaintiff for failure to make progress after October 12, 1966, relying on the reasons cited above, if those reasons in fact justified termination and continued after the waiver.

The specific reasons cited by the Board should be examined to determine if they were uncured after October 12, 1966, and justified termination for failure to make progress. The trial judge said that the default clause contemplates failure of actual, physical production, not merely a collateral threat to production due to inadequate financing, failure to honor warranties, and submission of improper progress payment requests. The trial judge concluded that the Board's determination was legally incorrect because it defaulted plaintiff for collateral threats to production, which at most constitute independent grounds for termination. The trial judge stated (trial judge's opinion at 12):

* * * [These collateral circumstances] must not be confused with production progress *per se.* The test of progress is production, and the criterion is existing delivery requirements. Progress means production, and does not mean curable threats to production such as insolvency.

■ We agree with the trial judge that plaintiff's failure to honor warranties and submission of improper progress payment vouchers are collateral matters and should not be construed as failure to make progress. The contracting officer relied on these two reasons as independent grounds

for termination. However, inadequate financing is not collateral when it pervades the entire contract. Plaintiff's lack of financing was the reason it was unable to progress since its suppliers were unwilling to provide the necessary parts because of their concern about plaintiff's financial position.

◼ Plaintiff's waiver of the 10 day cure notice was listed as a reason for the termination for failure to make progress. The trial judge states that this waiver was not related to plaintiff's failure to make progress. The Armed Services Board of Contract.Appeals considered a similar question in *C. C. Galbraith & Son, Inc.*, 67–2 BCA ¶ 6488. The contracting officer set a new delivery date after waiving the original delivery date and directed the contractor to show that it was taking corrective action to remedy its deficiencies thereby demonstrating its willingness and ability to perform within the extended delivery period. Failure to show that corrective action was being taken was regarded as failure to make progress. UFC's waiver of the 10 day cure notice indicates that it remained unable to make progress within the 10 day period.

◼ Failure to make progress is obviously something different from failure to deliver, or else the default clause would not provide separately for both. The trial judge, in our view, failed to allow for this difference and in effect holds that the only contractor who fails to make progress is one who fails to deliver. This cannot be. It is, as he says "almost a truism that a contractor who fails to make progress will also fail to deliver". To be sure, but does this mean that a contractor whose delivery date has not arrived must necessarily not have failed to make progress? It would seem the trial judge thought so. Thus he thinks condoning non-delivery is also condoning not making progress. We fear he has indulged in a staggering non-sequitur. The distance between failure to make progress and failure to deliver may be greater in the case of, e. g., a contract to build a single aircraft carrier, but it does not close to the infinites-

imal merely because the contract is for multiple units.

◼ As we read the default clause here to be construed, the "cure notice" provision for "failure to make progress" terminations is obviously intended to supply the absence of a specific time marker to advise when the minute for default has been reached, such as exists when a contract delivery date has passed without delivery. Thus to have prescribed a new delivery schedule also would have been supererogatory. The "cure notice" served its purpose. The contractor had already been asked to submit a new delivery schedule and had not done so. Nor had the contracting officer learned, from the contractor or any other source, any information to lead him to believe that deliveries would or could ever be resumed. In such circumstances, a unilateral delivery schedule prescribed by him would have been an exercise in futility, except for forensic purposes, should we be so foolish as to give the absence of such a schedule any legal significance or weight. Plaintiff was making no progress at all, had never manufactured a vehicle under the new specifications it had agreed to, did not have the necessary parts and could not obtain them and had allowed its labor force to wither away. If this situation is not what this failure to make progress clause is about and is not the exact case for which it was written, we are at a loss to understand why it was put in the contract at all. The contract having been properly terminated for failure to make progress, we need not grapple with the troublesome and difficult arguments the parties have offered us, concerning the other grounds for default alleged by the contracting officer and the Board. In any case, they appear to be make-weights as compared to the overwhelming impact of the failure to make progress.

### III.

Defendant, in its answer, presented three counterclaims totalling $2,363,508.04, plus interest. The first counterclaim alleges that there is an outstanding and unrecouped balance of $2,022,279.23, represent-

ing the excess of progress payment funds received by plaintiff from defendant over the amount properly credited to plaintiff for delivered items and inventory sold. The second counterclaim alleges that plaintiff owes defendant $300,716.26, the amount by which UFC "was overpaid as a result of the excise tax exemption which was effective after the tax inclusive date established by the contract." The third counterclaim, for $40,512.55, was based on plaintiff's alleged failure to meet its obligations under the Warranty Clause of the contract and the resultant cost to defendant to make repairs in delivered vehicles.

The counterclaims were not raised administratively nor were they briefed in defendant's motion for summary judgment. The trial judge dismissed the counterclaims, apparently because he felt that defendant had abandoned the claims. We do not think the defendant intended to abandon the counterclaims, but rather was postponing the claims pending the resolution of the merits of the termination action.

■ Defendant had filed suit in the United States District Court for the Northern District of Ohio, Civil Action No. C 71–303, pursuant to the False Claims Act, 31 U.S.C. Secs. 231–235 to recover amounts owed due to fraudulent progress payment vouchers, the subject matter of the first counterclaim. It is unfortunate that defendant did not file the False Claims suit in this court as a counterclaim so that we could adjudicate the matter with an understanding of the entire circumstances of this case. However, defendant is not required to file its False Claims action in this court. It is interesting that 28 U.S.C. Sec. 1500 provides that the Court of Claims does not have jurisdiction of any claim which the *plaintiff* has pending in another court. In *Frantz Equipment Co. v. United States*, 98 F.Supp. 579, 120 Ct.Cl. 312 (1951), the court held that where the plaintiff had filed a petition in this court based on the same subject matter as a counterclaim in the United States District Court for the Eastern District of Pennsylvania, suit was barred by 28 U.S.C. Sec. 1500. The provision was intended to bar

duplicate suits against the Government and therefore does not apply when the Government, a defendant in this court, files suit in another Federal court. We held in *Frantz Equipment Co. v. United States*, 105 F.Supp. 490, 496, 122 Ct.Cl. 622, 631 (1952), that the defendant does not lose its right to assert a counterclaim in this court because it filed suit in a District Court based on the same cause of action.

■ We do not think that the trial judge's dismissal of the first counterclaim was appropriate, since the Ohio suit was still pending at that time. A stipulation of compromise was filed in the District Court on May 4, 1976, dismissing the claims brought pursuant to the False Claims Act with prejudice. Defendant's claim that plaintiff received excess progress payment funds was dismissed without prejudice to the Government's right to raise the claim in this court or elsewhere without regard to the statute of limitations. We now have to determine whether plaintiff did in fact receive an excess of progress payment funds over the amount properly credited to plaintiff for delivered items and inventory sold. Since the compromise agreement was specifically without prejudice to the suit here, we should determine whether defendant is entitled to any relief. However, there has not been any hearing or fact finding of any kind on this issue in this court. Moreover, in view of the fact that neither the contracting officer nor the GSA Board of Contract Appeals has considered the merits of defendant's counterclaims we are remanding the counterclaim to the GSA, such officers or agencies as may be appropriate for administrative processing.

In defendant's request for review of the trial judge's decision, it asserts that the second and third counterclaims are redressable administratively and should be remanded to an administrative tribunal. Defendant argued that it did not pursue its administrative remedies on them pending a final outcome on the merits of the default termination. There has not been any determination as to the merits of the counterclaims. *See, Nager Elec. Co. v. United*

**400**

*States,* 442 F.2d 936, 194 Ct.Cl. 835 (1971). Defendant did not pursue its claims below because it was defending the propriety of the default termination, a preliminary or threshold question. We are not granting summary judgment on the second and third counterclaims but instead remand along with defendant's first counterclaim to the GSA, for administrative processing. *Martin Lane Co. v. United States,* 432 F.2d 1013, 193 Ct.Cl. 203 (1970), does not apply.

In conclusion, we hold that plaintiff's contract was properly terminated for failure to make progress. Accordingly, plaintiff is not entitled to recover on its claims, plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted. The dismissal of plaintiff's petition will await final action on defendant's counterclaims. Further proceedings in this court are stayed for six months and we remand the case to the General Services Administration, such officers or agencies as may be appropriate, pursuant to Pub.L. 92–415, 86 Stat. 652, and the court's Rule 149(b), to determine the merits of all three of defendant's counterclaims. Defendant's counsel is instructed to advise the court of the status of the proceedings at 90-day intervals, pursuant to Rule 149(f).