ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| U.S. Aeroteam, Inc. | ) ASBCA Nos. 61933, 61934 |
| | ) |
| Under Contract No. FA8526-12-C-0039 | ) |

APPEARANCE FOR THE APPELLANT:     Milton Johns, Esq.
                                    Executive Law Partners, PLLC
                                    Fairfax, VA

APPEARANCES FOR THE GOVERNMENT:   Caryl A. Potter, III, Esq.
                                    Air Force Deputy Chief Trial Attorney
                                   Isabelle P. Cutting, Esq.
                                   Michael Farr, Esq.
                                    Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE O'CONNELL
PURSUANT TO BOARD RULE 11

The Air Force terminated for default a contract with U.S. Aeroteam, Inc. (USAT), for failure to make progress furnishing trailers used to transport aircraft engines and demanded the return of progress payments. The parties have elected to submit the appeals on the record pursuant to Board Rule 11. USAT previously filed an appeal with the United States Court of Federal Claims (COFC) regarding the denial of its claims for additional costs under two contracts (including the above-captioned contract) related to running gear for the trailers. After the COFC ruled in favor of the government, USAT filed an appeal at the United Stated Court of Appeals for the Federal Circuit, which affirmed the lower court's decision. *U.S. Aeroteam, Inc. v. United States*, 2022 WL 2431626 (Fed. Cir. 2022). For the reasons discussed below, we conclude that the government has adequately supported the default termination as well as the return of a portion of the progress payments. The Board denies the appeals.

FINDINGS OF FACT

1. USAT is a contractor that specializes in building components for the aerospace industry. *U.S. Aeroteam, Inc. v. United States*, 2022 WL 2431626 at *1 (*USAT*) (Fed. Cir. 2022).

2. On September 6, 2012, the Air Force awarded USAT Contract No. FA8526-12-C-0039 (the 0039 contract), a firm fixed price contract for 86 trailers to be used for

transporting C-17 aircraft engines (R4, tab 1 at 1-4). At that time, USAT was performing a similar contract that the Air Force had awarded in 2009, No. FA8526-09-C-0007 (the 007 contract) (compl. ¶¶ 1-2). The 007 contract is not at issue in these appeals, but it has some bearing on the facts because USAT experienced the same problem on both contracts.

3. The original price for the (0039) contract was $15,477,850, or $179,975 per trailer (R4, tab 1 at 1-3). The government exercised an option to add an additional 12 trailers at $184,975 each for a total of 98 trailers (R4, tabs 3, 5-6).

4. The contract contained various clauses including Federal Acquisition Regulation (FAR) 52.232-16, PROGRESS PAYMENTS (APR 2012); FAR 52.233-1, DISPUTES (JUL 2002); and FAR 52.249-8, DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) (APR 1984) (R4, tab 1 at 15, 17-18).

5. Originally, the trailers were to be delivered within 280 days of order but two bilateral schedule modifications along with the modifications ordering additional trailers pushed the last delivery to July 2016 (R4, tab 1 at 3, tabs 2-6).

6. The government made progress payments to USAT almost every month from April 5, 2013 to May 4, 2015 (*see* R4, tabs 27-54 (each tab is a progress payment sheet); R4, tab 18 at 2).

*USAT Submits REAs*

7. Although not before the Board in the present appeals, on or about January 31, 2015, USAT submitted requests for equitable adjustment (REAs) on both the 007 and 0039 contracts (app. supp. R4, tab 2 at ¶¶ 9-10; No. 61973, R4, tab 20 at 167 (hereinafter "REA at 167"); ASBCA Nos. 61972, 61973, joint stipulation of facts (JSF) ¶¶ 42-43). The REA for the 0039 contract sought $4,531,523 for 11 items that USAT referred to as "factors" (JSF ¶ 43).

8. By far the largest single element in each REA was factor 1, which related to the running gear for the trailers (app. br. at 2; JSF ¶ 43). For the 0039 contract, USAT sought an additional $3,559,810 for this factor (JSF ¶ 43).[1] The running gear is essentially a drive train for the trailer, which allows it to roll, brake, and steer. The running gear was the largest and most expensive sub-assembly for the trailer. USAT obtained the running gear from a subcontractor, PDI Ground Support Systems (PDI). *USAT*, 2022 WL 2431626 at *1; (JSF ¶ 43; app. supp. R4, tab 54; app. br. at 2)

---

[1] For the 007 contract, USAT sought $1,092,415 for the running gear (JSF ¶ 42).

9. In 2011 (nine months or more before the parties executed the 0039 contract), PDI experienced financial difficulties and attempted to raise its price per unit from an agreed upon $20,300 to at least $38,000. *USAT*, 2022 WL 2431626 at *1; (REA at 6, 168).

10. USAT formally asked the Air Force if it could assume responsibility for manufacturing the running gear. The contracting officer (CO) granted the request, but USAT incurred higher costs than it expected. *USAT*, 2022 WL 2431626 at *1. The REA stated that the PDI cost per trailer had been $20,300 but USAT's cost to manufacture was $56,625 (REA at 168).

11. The parties executed Modification No. 10 (Mod 10) on March 2, 2016, to give USAT some relief while the government considered the REA by suspending the schedule but requiring USAT to make a good faith effort to continue production (R4, tab 11). The modification stated:

> The purpose of this modification is to extend the delivery schedule of CLINs 0001AA, 0001AB, 1001AA, 1001AB, 1001AC, 1001AD, 1001AE, and 1001AF indefinitely. A firm delivery schedule will be established upon resolution of the REAs submitted for FA8526-09-C-0007 and FA8526-12-C-0039.
>
> . . .
>
> USAeroteam shall make a good faith effort to continue to produce and ship units prior to REA resolution and establishment of a firm delivery schedule.
>
> All other terms and conditions remain unchanged and in full force and effect.

(*Id.* at 3)

*USAT Fails to Manufacture any Trailers after Mod. 10*

12. USAT did not manufacture any trailers after the execution of Mod. 10. At the time the modification was executed, USAT had four completed trailers on hand that it had not delivered to the Air Force (R4, tabs 119 at 2, 120 at 1). USAT delivered two of those trailers on March 9, 2016; it delivered the third trailer on March 23, 2016, and the fourth on June 23, 2016. USAT did not deliver any trailers after June 23, 2016. USAT delivered 58 of the 98 trailers ordered. (R4, tab 23 at 1; app. supp. R4 tab 33 at 1)

3

13. On June 28, 2016, the parties addressed the pending REA in bilateral Modification No. 11 (Mod. 11). Mod. 11 provided payment of $136,542.21 to USAT for REA Factors 5 and 6 and stated that the interest that USAT had requested in Factor 4 was unallowable. The modification left the remaining issues open to allow USAT to submit further documentation:

> REA factor Numbers 1, 2, 3, 4 (except interest as addressed above), 7, 8, 9, 10, and 11 are considered "open" pending the Contractor's submission of adequate supporting documentation in accordance with FAR 31.201-2(d).

(R4, tab 12 at 1-2)

14. On November 10, 2016, the contracting officer (CO) wrote by email to USAT to inquire about re-establishing a delivery schedule. The CO stated that the government had understood that USAT would resume production once its facility relocated and that USAT had informed the government over the summer that it had enough material on hand to manufacture 5-6 trailers. He stated that "[d]elivering new trailers represents the surest way for USAT to liquidate the $3.54M in overpaid progress payments currently owed to the AF. . . ." Among other things, he asked USAT to propose a schedule by December 1, 2016. (App. supp. R4, tab 22)

15. USAT responded by email on November 14, 2016, stating that it was working on a request for a CO's final decision. USAT did not propose a delivery schedule but instead stated "[w]e need to make a good progress on your side to resolve the REA/COFD, before we know our action plans. . . ." (*Id.*)

16. USAT also responded to the CO by formal letter on November 30, 2016. It contended that the purpose of Mod. 10 was to alleviate USAT's "cash crunch" caused "primarily" by the running gear. (App. br. at 2 (citing app. supp. R4, tab 24)) USAT stated that, due to its financial condition "and the fact that the REAs have not been resolved, we are unable to commit to a 'firm delivery schedule' with *immediate* deliveries but could propose a longer term schedule." USAT did not provide any specifics on what this schedule would be, but it again stated that it was working on a request for a contracting officer's final decision. (App. supp. R4, tab 24 at 2) (emphasis in original))

4

*The Running Gear Claims and Litigation*

17. On February 24, 2017, USAT submitted a certified claim for $4,022,273 limited to the running gear. The CO denied the claim on July 28, 2017. (App. supp. R4, tab 2 at ¶¶ 13-14); *USAT*, 2022 WL 2431626 at *1-*2.[2]

18. On July 26, 2018, USAT filed suit on that claim in the United States Court of Federal Claims (app. supp. R4, tab 2 at ¶ 15).

19. After a trial, the Court of Federal Claims ruled from the bench in favor of the government. *USAT*, 2022 WL 2431626 at *2. USAT appealed to the United States Court of Appeals for the Federal Circuit, which affirmed the trial court's decision. The court of appeals held that USAT failed to prove its contention that the Air Force ordered it to manufacture the running gear. *Id.* at *2. Rather, it held that it was USAT's "choice" to manufacture it. *Id.* The court observed that PDI did not refuse to manufacture the running gear. Rather, PDI only demanded a higher price, which USAT chose not to pay (apparently because USAT believed that it could produce the running gear "as well or better than PDI"). *Id.* at *2-*4. The court of appeals held that an increase in a subcontractor price was part of the risk that USAT assumed in entering into a firm fixed price contract. *Id.* at *5.

*First Cure Notice*

20. On May 25, 2017, while the running gear claims were still pending before the CO, USAT wrote to the government by email stating it "would like nothing better than to resume production as soon as possible to make final delivery of the trailers" but that it would "need[] additional capital to make this a reality." It stated that it was "making an unusual request." USAT asked the Air Force to advance it 25% of the value of the pending claims on the two contracts so that the parties could "achieve all of our mutual goals." (App. supp. R4, tab 29 at 1) There does not appear to be a government response to this email in the record.

21. By email dated July 5, 2018, USAT informed the Air Force that it was "not in a position to produce additional RG [running gear] until REA favorably adjudicated. . ." (R4, tab 121 at 1).

22. On July 18, 2018, the CO wrote to USAT stating that USAT's "failure to make progress in delivering the remaining units under this contract" was "a condition that is endangering performance of the contract." The CO stated that unless the condition was cured within 10 days, the government would consider terminating the

---

[2] At the same time, USAT submitted a claim for $1,385,912 for the running gear on the 007 contract that the CO also denied. *USAT*, 2022 WL 2431626 at *1-*2.

contract for default. The CO demanded a written response, including "a detailed manufacturing schedule to prove compliance with the delivery schedule established in the attached modification." (R4, tab 17)

23. The attached Modification No. 13[3] (Mod. 13) set a schedule in which USAT would deliver three trailers on August 30, 2018, and then three trailers every month until USAT completed its work with the delivery of four trailers on August 30, 2019 (R4, tab 14 at 2).

24. USAT responded to the CO's July 18, 2018 letter on August 1, 2018. USAT stated that the delivery schedule in Mod. 13 was "unreasonable" and "unenforceable" (R4, tab 18 at 1). It stated that the REAs on the two contracts "were necessary" because the government had breached the contracts by directing CO to bring the running gear in-house. It stated that the REAs had not been resolved. (*Id.* at 2) USAT stated that it would have to restart its production line, but that, between May 2015 and December 2016, it had "let go approximately 60 percent of its trained, experienced production employees" (*id.* at 3). USAT contended that the government had breached the contract by suspending progress payments after June 2015. USAT also contended that the government breached the contract because USAT had expected PDI to produce the running gear but USAT had to take over production of the running gear, which USAT contended was a cardinal change. (*Id.* at 3-4)

25. The CO responded to USAT on August 10, 2018. The CO stated, among other things, that the REA had been resolved on May 17, 2016, and that, while the government had allowed USAT to submit new documentation in support of the various factors, USAT had never done so.[4] The CO stated that the delivery schedule in Mod. 13 was not unreasonable and was based on the schedule that existed prior to suspension of the schedule in Mod. 10. (R4, tab 19 at 1) (*see* R4, tab 4 at 2-3 (modification 3 establishing schedule in which USAT would deliver 3 or 4 trailers in most months))

26. USAT did not deliver any trailers on August 30, 2018. The CO then wrote to USAT on September 24, 2018, asking USAT to propose a reasonable schedule. The CO stated that the schedule should be proposed based on the understanding that the government would not make any payment on the existing claims. (R4, tab 20)

---

[3] The CO did not sign the copy of Mod. 13 in the record (R4, tab 14). However, the context indicates that the CO considered it to be in effect because he rescinded Mod. 13 when he terminated the contract for default (R4, tab 15 at 1-2).

[4] A May 17, 2016 document is not in the record but, as described above, bilateral Mod. 11 dated June 28, 2016, documented the actions taken on the REA (finding 13).

6

27. On October 5, 2018, USAT responded. It contended that Mod. 13 was not reasonable and that there was no enforceable schedule. It stated that under Mod. 10 the schedule was on hold until the REA had been resolved and it contended that the REA was pending before the Court of Federal Claims. (R4, tab 21 at 1) However, it did propose a schedule. The schedule called for a six-month ramp-up phase because USAT stated that it had reduced its staff on the contract from 76 to 26 people. It proposed to produce one trailer nine months after the issuance of a contract modification, one trailer after 10 months, two trailers in the 11th and 12th months, and three trailers per month thereafter until contract completion. (*Id.* at 2) However, contrary to the instructions of the CO, USAT made this schedule contingent upon settlement of the running gear lawsuit (*Id.*).

28. On November 16, 2018, USAT submitted a certified claim on REA factors 2 to 4 and 7 to 11 in the amount of $4,460,952 (61973, R4, tab 28). This was a large increase from the amount sought for these factors in the REA. Most of this increase related to factor 11, "Impact on Business/other deliveries and Interruptions to Production," which USAT increased from $574,265 to $4,054,265 (*compare* REA 61973, R4, tab 20 at 166 and 61973, R4, tab 28 at 2).[5] The CO did not issue a final decision and USAT filed an appeal with the Board on February 19, 2019, that the Board docketed as no. 61973. That appeal remains pending.

*Second Cure Notice and Termination*

29. On November 28, 2018, the CO sent USAT another cure notice. The CO stated "you are required to respond to this notice in writing, and your response shall outline any past or current efforts being made by U.S. Aeroteam to continue producing and shipping units" since the issuance of Mod. 10. The CO also stated that if USAT could not cure the default, the CO was willing to delete the remaining trailers on the contract if USAT returned $3,670,239.50 in unliquidated progress payments. (R4, tab 22)

30. USAT responded on December 7, 2018. USAT stated that it was not in default of the contract. USAT contended that "Mod. 10 does not require USAT to make continuous actual progress in production, prior to the establishment of a firm delivery schedule." It stated that the four trailers it had delivered in March and June of 2016 after the execution of Mod. 10 satisfied its obligations under that modification. It did not propose a new schedule and once again referenced settlement of the pending claims and litigation in connection with a resumption of production. (R4, tab 23 at 1- 2)

---

[5] USAT also submitted a certified claim on the remaining factors on the 007 contract (ASBCA Nos. 61972, 61973, JSF ¶ 42).

7

31.  On December 13, 2018, the CO terminated the contract for default based on a "failure to make progress as to endanger performance of the contract" and "[o]mission of stopping work under the contract" (R4, tab 24).

32.  On this same date, the CO issued a final decision demanding $3,670,239.50, which was his calculation of the amount that USAT had received in progress payments but had not liquidated through deliveries of trailers. (R4, tab 25 at 1).  USAT does not appear to contest that it has been paid for more than the 58 trailers it delivered because it states in its brief that it "estimates it would owe no more than $3,148,062" (app. br. at 11; *see* app. supp. R4 tab 29 (email from USAT president estimating that USAT would need to deliver 18 more trailers to liquidate the progress payments)).

33.  USAT filed a timely appeal of both decisions on January 10, 2019.  The Board docketed the termination for default as No. 61933 and the Air Force money demand as No. 61934.

<u>DECISION</u>

I.  <u>Standards of Review</u>

"When a CO terminates a contract for default, and the contractor appeals that termination decision, 'the government ... bear[s] the burden of proof with respect to the issue of whether termination for default was justified.'" *Dep't of Transp. v. Eagle Peak Rock & Paving, Inc.*, 69 F.4th 1367, 1375 (Fed. Cir. 2023) (quoting *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987)).  "In failure-to-make-progress cases, the government must establish that 'the contracting officer's decision to terminate ... was reasonable given the events that occurred before the termination decision was made.'" *Id.* (quoting *Empire Energy Mgmt. Sys., Inc. v. Roche*, 362 F.3d 1343, 1357–58 (Fed. Cir. 2004)).  "If the government makes this showing, the contractor then bears the 'burden of proving that its nonperformance was excusable.'" *Id.* (quoting *DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir. 1996)).

II.  <u>Contract Clauses</u>

FAR 52.249-8, DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) (APR 1984) provides that the government may terminate a contract for default if the contractor fails to. . .

>    (ii)  Make progress, so as to endanger performance of this contract (but see subparagraph (a)(2) of this clause ); or

8

> (iii) Perform any of the other provisions of this contract (but see subparagraph (a)(2) of this clause).
>
> (2) The Government's right to terminate this contract under subdivisions (1)(ii) and (1)(iii) of this clause ], may be exercised if the Contractor does not cure such failure within 10 days (or more if authorized in writing by the CO) after receipt of the notice from the CO specifying the failure.

FAR 52.249-8(a) (finding 4).

A second clause is also significant with respect to USAT's demand for payment of the disputed claims before it would agree to resume work. FAR 52.233-1, DISPUTES (JUL 2002) specifies the procedures for a contractor to submit a claim to the CO pursuant to the Contract Disputes Act (finding 4). However, it specifically requires the contractor to continue working while the claim is pending:

> (i) The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the CO.

FAR 52.233-1(i).

Finally, with respect to the government's demand for the return of progress payments, FAR 52.232-16, PROGRESS PAYMENTS, provides "[i]f this contract is terminated under the Default clause, (i) the Contractor shall, on demand, repay to the Government the amount of unliquidated progress payments. . . ."

FAR 52.232-16(h) (finding 4).

III.    Analysis – ASBCA No. 61933

The Federal Circuit's *USAT* opinion and the record demonstrate that the problems on this contract arose when the running gear subcontractor raised its price, USAT chose not to pay that price, and USAT began producing the running gear in-house, which resulted in the cost nearly tripling (findings 9-10). The consequences of these events cannot be pinned on the government. *USAT*, 2022 WL 2431626 at *2 - *5. Accordingly, while USAT repeatedly alleged that the government breached the contract when USAT began manufacturing the running gear in-house and cited the running gear as the cause of its inability to perform (findings 16, 19-21, 24, 27), the Federal Circuit's and Court of Federal Claims' decisions have foreclosed USAT's

9

reliance on those contentions. *See also New Era Cont. Sales, Inc.*, ASBCA No. 56661 *et al.*, 11-1 BCA ¶ 34,738 at 171,022-23 (subcontractor price increase does not excuse a contractor's default).

USAT repeatedly demanded money or payment of the pending REA/claims before it would resume work (findings 15, 21, 27, 30). But the Disputes clause prohibited USAT from withholding its performance. The Court of Claims upheld a termination for default when, in the context of a dispute about a borrow area, the contractor refused to switch to an alternate borrow area unless the government agreed to pay additional money on a pending change order. *Discount Co. v. United States*, 554 F.2d 435, 440 (Ct. Cl. 1977). The Court of Claims called this "precisely the kind of controversy to be handled under the 'disputes' mechanism by appeal to the Board if necessary." *Id.* Even if the CO's interpretation of the contract is incorrect, a contractor is bound to proceed with the performance directed by the CO and then submit a claim. *Benju Corp.*, ASBCA No. 43648, 97-2 BCA ¶ 29,274 at 145,654-55 *aff'd* 178 F.3d 1312, *3 (Fed. Cir. 1999) (non-precedential).

This appeal is comparable to *Universal Fiberglass Corp. v. United States*, 537 F.2d 393 (Ct. Cl. 1976). In that case, a contractor struggled to produce mailsters (a small mail-delivery truck) and the agency repeatedly extended the deadlines. *Id.* at 394-95. After the contractor failed to meet several revised schedules, the agency wrote to the contractor, asking it to propose a schedule. The Court of Claims held that the letter waived the default up to that date but not the failure to make progress. The court held that the letter was "more in the nature of a warning that such failure [to make progress] was not unnoticed." *Id.* at 397. The court held that the contractor's actions up to the date of the government's request for a schedule "indicate a pattern of nonperformance and delay which should not be ignored." *Id.*

In upholding the termination, the Court of Claims cited the following facts that we find to be the same or similar to those in this appeal: the contractor had been asked to submit a new delivery schedule but had not done so[6]; the CO had not received "any information to lead him to believe that deliveries would or could be resumed"; the contractor "was making no progress at all"; the contractor did not have the financial resources to buy parts; and it "had allowed its labor force to wither away." *Universal Fiberglass*, 537 F.2d at 398. The court observed: "[i]f this situation is not what this failure to make progress clause is about and is not the exact case for which it was written, we are at a loss to understand why it was put in the contract at all." *Id.*

USAT contends that Mod. 10, which suspended the delivery schedule "indefinitely" (finding 11), justifies its actions. We disagree. Mod. 10 was not a

_____

[6] As we have found, USAT did submit a proposed schedule but improperly tied it to the government paying disputed amounts (finding 27).

suspension of work in the usual sense because the modification also required that USAT "make a good faith effort to continue to produce and ship units prior to REA resolution and establishment of a firm delivery schedule" (*id.*). USAT has contended that furnishing the Air Force with four trailers in March and June of 2016 was enough to constitute a good faith effort (finding 30). The Board does not agree that this was a good faith effort. The trailers that it delivered after Mod. 10 were already on hand; it failed to manufacture any units after execution of the modification (finding 12) and repeatedly indicated that it did not intend to do so absent a decision on the REA (findings 15, 21, 24, 27). Mod. 10 required USAT to make a good faith effort "to produce and ship units," not merely to ship those it had already manufactured. At the very least, good faith would have required that USAT inform the Air Force prior to execution of the modification that it could not or would not "produce" any more trailers unless the Air Force agreed to pay the running gear claim. We conclude that USAT's failure to manufacture a single trailer in the two-year, nine-month, period between execution of Mod. 10 and the default termination does not represent a good faith effort.

Moreover, a key part of Mod. 10 is the language providing that "[a] firm delivery schedule will be established upon resolution of the REAs" (finding 11). This raises the question as to when the REA was resolved. The government contends that the language refers to resolution of the REA itself, while USAT contends that it included not only resolution of the REA, but also resolution of the claim to the CO, its actions in the Court of Federal Claims and the Board, and its appeal to the Federal Circuit. (finding 27; app. br. at 5 n.3). Mod. 10's specific reference only to the REA and lack of reference to other potential steps in the dispute resolution process indicate that the parties intended to include only the then-pending REA. The Board further finds USAT's interpretation implausible simply because the timeframe for resolution of an REA, the subsequent certified claims, and litigation at either the Court of Federal Claims or the Board, and an appeal(s) to the Federal Circuit involves an unpredictable and potentially lengthy timeframe. The Board does not believe that the Air Force would agree to put a contract involving an important cargo aircraft on hold for an indefinite period beyond its control or that USAT could reasonably interpret the Mod. to have that result.

The Board interprets Mod. 10 to mean what it says: that the suspension was only in effect until the REA itself was resolved. In our view, there were three relevant milestones in determining when the REA had been resolved. First, there was Mod. 11 on June 28, 2016, in which the government agreed to pay USAT for two of the 11 REA factors but left open everything else except for interest on factor 4 so that USAT could submit "adequate supporting documentation" (finding 13). The modification did not specify a deadline for USAT to submit this documentation. Although it appears that the Air Force was remarkably patient with USAT, we do not interpret Mod. 11 to mean that USAT had an unlimited amount of time to provide the documents. Rather,

11

we interpret it to mean that USAT had a reasonable period of time to submit the documents.  *See B-E-C-K Constructors v. United States*, 571 F.2d 25, 31 (Ct. Cl. 1978).  We note that, on August 10, 2018, more than two years after issuance of Mod. 10, the CO wrote to USAT stating that USAT had failed to submit any new documents (finding 25).  Certainly, by August 2018 a reasonable period of time had expired, and the REA was resolved by USAT's failure to produce the documents.

The second relevant date is February 24, 2017, when USAT submitted a certified claim on the running gear (finding 17).  A claim is a separate step in the process and is distinct from an REA.  An REA represents an attempt by the contractor to negotiate a resolution to the matter, for which it is sometimes entitled to recover its legal, accounting, and consulting costs.  But it is not entitled to these costs if it has submitted a claim.  *Bill Strong Enters., Inc. v. Shannon*, 49 F.3d 1541, 1549-50 (Fed. Cir. 1995), *rev'd on other grounds, Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995).  By contrast, a claim has the advantage of enabling the contractor to initiate litigation if the claim is denied and it starts the clock on interest.  Contract Disputes Act (CDA), 41 U.S.C. §§ 7104, 7109.  USAT's submission of a certified claim for the running gear indicates that it considered the REA to have been denied as to the running gear and, in any event, it put an effective end to the REA process for the running gear.

The third milestone was November 16, 2018, when USAT submitted a certified claim for REA factors 2-4 and 7-11 (finding 28).  This ended the REA process for the remaining issues to the extent that the REA had not already been resolved by USAT's failure to submit supporting documentation.  The CO sent USAT one more cure notice on November 28, 2018, but this only resulted in USAT once again raising payment of its claims as a precondition to resumption of work (findings 29-30).  Mod. 10 required the parties to establish a new schedule after the REA had been resolved.  USAT failed to act in good faith when it refused to agree to a new schedule if it did not include payment on the pending REA/claim (findings 15, 21, 27, 30).

Finally, we reject USAT's reliance on *Technocratica*, ASBCA Nos. 47992 *et al.*, 06-2 BCA ¶ 33,316, in support of a contention that the government may not terminate a contract for default for failure to make progress when there is no firm delivery schedule in place (app. br. at 12).  In *Technocratica*, the Board held that the government had waived the right to terminate after the completion date passed and the appellant kept working for 10 to 13 months in reliance upon the government's failure to terminate.  *Technocratica*, 06-2 BCA ¶ 33,316 at 165,187-88.  However, in this appeal the completion date did not pass, and the facts are more like those in *Universal Fiberglass* where the government tried unsuccessfully to establish a new schedule and get the contractor to resume deliveries.  *Universal Fiberglass*, 537 F.2d at 398.

In summary, the Board concludes the government has supported the termination for default by the great weight of the evidence because USAT did not produce any trailers after Mod. 10, its actions "indicate a pattern of nonperformance and delay which should not be ignored" and the CO had no "information to lead him to believe that deliveries would or could ever be resumed." *Id.* Additionally, USAT has failed to show, based on the record in this appeal, that its non-performance was excusable. Thus, the termination was proper. *DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir. 1996).

IV.    Return of Unliquidated Progress Payments – ASBCA No. 61934

As described above, the Progress Payments clause requires the contractor to repay the government the amount of any unliquidated progress payments, that is, the amount of progress payments paid but not liquidated through deliveries of finished products.  FAR 52.232-16(h).  The parties agree that USAT has been paid for more than the 58 trailers that USAT delivered.  The government calculates the overpayment at $3,670,239.50, while USAT "estimates it would owe no more than $3,148,062" (finding 32).  This would appear to be indicate that USAT has been paid for somewhere between 17 and 20 trailers that it failed to deliver.  Because we conclude that the termination for default was proper, USAT must return these progress payments.  Accordingly, the Board returns this matter to the parties to determine the quantum of the overpayment.

CONCLUSION

For the foregoing reasons, we hold that the government's termination of the contract was proper, and that the appeal (ASBCA No. 61933) is denied.  We further hold that the government is entitled to the repayment of unliquidated progress payments and deny that appeal (ASBCA No. 61934).  Accordingly, the matter is returned to the parties to determine quantum consistent with this decision.

Dated:  May 14, 2025

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

(Signatures continued)

13

I concur                                                 I concur


_____                    _____
OWEN C. WILSON                              THOMAS P. MCLISH
Administrative Judge                        Administrative Judge
Acting Chairman                             Armed Services Board
Armed Services Board                        of Contract Appeals
of Contract Appeals


    I certify that the foregoing is a true copy of the Opinion and Decision of the
Armed Services Board of Contract Appeals in ASBCA Nos. 61933, 61934, Appeals of
U.S. Aeroteam, Inc., rendered in conformance with the Board's Charter.

    Dated:  May 14, 2025


                              _____
                              PAULLA K. GATES-LEWIS
                              Recorder, Armed Services
                              Board of Contract Appeals